# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2020-NMCA-034

Filing Date: February 26, 2020

No. A-1-CA-36400

STATE OF NEW MEXICO,

Plaintiff-Appellee,

v.

JOSHUA JACKSON,

Defendant-Appellant.

APPEAL FROM THE DISTRICT COURT OF CURRY COUNTY
Drew D. Tatum, District Judge

Certiorari Denied, June 9, 2020, No. S-1-SC-38203. Released for Publication August 11, 2020.

Hector H. Balderas, Attorney General
Santa Fe, NM
Meryl E. Francolini, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Kathleen T. Baldridge, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## OPINION

**MEDINA, Judge.**

**{1}** Defendant Joshua Jackson appeals his convictions for kidnapping with intent to commit a sexual offense, contrary to NMSA 1978, Section 30-4-1(A) (2003); two counts of criminal sexual penetration in the second degree (in the commission of a felony) (CSP II), contrary to NMSA 1978, Section 30-9-11(E)(5) (2009), two counts of felony aggravated battery against a household member, contrary to NMSA 1978, Section 30-3-

16(C) (2008, amended 2018),[1] criminal sexual contact (CSC) with a deadly weapon, contrary to NMSA 1978, Section 30-9-12(C) (1993), and misdemeanor aggravated battery against a household member, contrary to Section 30-3-16(B). Defendant argues that his convictions should be vacated because the State failed to join the instant case with a previous case, in violation of our compulsory joinder rule. Defendant also challenges his convictions on the basis of double jeopardy, ineffective assistance of counsel, and sufficiency of the evidence. We hold that Defendant waived his compulsory joinder claim by failing to raise the issue before his second trial. We further hold that (1) Defendant's convictions did not violate double jeopardy, (2) Defendant failed to establish a prima facie case for ineffective assistance of counsel, and (3) Defendant failed to develop his sufficiency argument. Accordingly, we affirm.

## BACKGROUND

**{2}**     Defendant was charged in two separate cases based on events that occurred between Defendant and his former girlfriend (Victim) on April 4, 2015 and April 10, 2015. The first case, *State v. Jackson*, Ninth Judicial District Court Case No. D-905-CR-2015-00136 (*Jackson I*), was filed on May 4, 2015, and charged Defendant with kidnapping with intent to inflict physical injury and battery against a household member based upon the April 10, 2015 events. The second case, *State v. Jackson*, Ninth Judicial District Court Case No. D-905-CR-2015-00135 (*Jackson II*), was also filed on May 4, 2015—one minute before *Jackson I*—and charged Defendant with the crimes he now appeals based on the April 4, 2015 events. Defendant was arraigned in both cases at the same time on May 8, 2015. Following a jury trial in February 2016, Defendant was convicted of both crimes as charged in *Jackson I*. One year later, Defendant was found guilty of all crimes as charged in *Jackson II*. We provide the following outline of Victim's testimony given at Defendant's trials, reserving discussion of additional facts and testimony as necessary for our analysis.

## Testimony from *Jackson I*

**{3}**     Victim testified that she was in a relationship with Defendant in April 2015, who was living at her house "off and on." On the afternoon of April 10, 2015, Defendant called Victim and requested to come over to Victim's house to collect some of his belongings. When Defendant arrived, Defendant and Victim began arguing. At some point during the argument, Defendant punched Victim in the ribs. Defendant then went into the other room to collect his belongings, at which point Victim "took off running" out the front door because she was afraid Defendant would continue to hit her. Defendant ran after Victim and caught up with her in an alleyway, and Victim fell to the ground. Defendant pulled Victim's hair and dragged her back to the house by her arm.

**{4}**     Once back in the house, Defendant locked the door, stood in front of it, and told Victim, "Stop being stupid. Don't run out there. I'm not going to hit you." When Victim agreed to stay, Defendant went into the other room to collect his belongings. At that point, Victim again "took off running" out the front door, screaming for help. Defendant

---

[1]All references shall be to the 2008 version of the statute.

again caught up with Victim, grabbed her, and began carrying her back to her house. Victim grabbed a nearby telephone pole in an attempt to stop Defendant from taking her back into the house. Defendant then bit Victim, prompting her to let go, and carried her back to the house. Sometime later, when Defendant was in another room, Victim ran out the front door for a third time, successfully escaping and alerting the authorities.

**Testimony from *Jackson II***

**{5}** Victim testified that on April 4, Victim and Defendant began arguing at a friend's house because Defendant wanted to smoke methamphetamine, whereas Victim did not. The argument continued as Victim and Defendant returned to Victim's house, where things escalated. Defendant punched Victim in the face, prompting Victim to scream and run toward the front door. Defendant chased after Victim, locked the front door, and told the Victim "to go sit down." Even though Victim did not want to, she sat down. Defendant again struck Victim and told her to go into the bathroom. When Victim did not obey, Defendant dragged Victim by her hair into the bathroom.

**{6}** Once in the bathroom, Defendant "put all his weight" on Victim, pulled her pants down, and inserted a stick into Victim's anus. Defendant then tried to put a folding knife in Victim's vagina, cutting her in the process and causing her to bleed. At some point during the struggle, Defendant forced Victim into the bathtub and scalded her with hot water. When Victim tried to get out, Defendant stood in front of her and forced his penis in Victim's mouth. Victim bit Defendant's penis, which prompted Defendant to punch her again in her face—causing her tooth to go through her lip.

**{7}** Victim did not report the incident until April 16—six days after she first spoke with police regarding the April 10 incident. When asked why Victim did not report the incident right away, Victim responded, "Because I was locked in the house with him. I couldn't go nowhere." During cross-examination, defense counsel asked if Defendant ever left the house on April 4, to which Victim responded, "He didn't leave until that day I took off running from him." In response to defense counsel's question asking Victim if she smoked methamphetamine or drank before she reported the incident, Victim answered, "No, I did not drink, I didn't do nothing. I was just with him, like I couldn't even leave my house. Like we were just sitting in the house all day watching TV." Defense counsel then confirmed, "It's your testimony that he didn't leave the house at all over the next ten days?" to which Victim appeared to respond affirmatively.

**DISCUSSION**

**I.    Compulsory joinder**

**{8}** We begin by addressing Defendant's argument that his convictions stemming from *Jackson II* should be vacated because the State violated Rule 5-203(A) NMRA, our compulsory joinder rule, by failing to join *Jackson I* and *Jackson II*. The State, in turn, argues that Defendant waived his claim for compulsory joinder because he failed to invoke Rule 5-203(A) below. Alternatively, the State argues that it was not required to

join Defendant's charges because they stemmed from two separate incidents of distinct nature. We conclude that Defendant waived his compulsory joinder claim by failing to raise the issue before jeopardy attached in *Jackson II*, and that the failure to join did not constitute fundamental error. In making these determinations, we need not address the issue of whether Defendant's charges should have been joined.

**Standard of Review**

**{9}** "The proper interpretation of our Rules of Criminal Procedure is a question of law that we review de novo." *Allen v. LeMaster*, 2012-NMSC-001, ¶ 11, 267 P.3d 806. "When construing our procedural rules, we use the same rules of construction applicable to the interpretation of statutes." *State v. Aslin*, 2020-NMSC-004, ¶ 9, ___ P.3d ___ (internal quotation marks and citation omitted). "We begin by examining the plain language of the rule as well as the context in which it was promulgated, including the history of the rule and the object and purpose." *Id.* (internal quotation marks and citation omitted). "If the language of the [rule] is clear and unambiguous, we must give effect to that language and refrain from further . . . interpretation." *State v. Wilson*, 2010-NMCA-018, ¶ 9, 147 N.M. 706, 228 P.3d 490 (internal quotation marks and citation omitted). On the other hand, if the rule's language is "doubtful, ambiguous, or an adherence to the literal use of the words would lead to injustice, absurdity, or contradiction," we construe the rule "according to its obvious spirit or reason." *State v. Padilla*, 2008-NMSC-006, ¶ 7, 143 N.M. 310, 176 P.3d 299 (internal quotation marks and citation omitted).

**A.  Compulsory Joinder and the Remedy of Dismissal**

**{10}** "At common law, whether charges should be joined in the same indictment was a matter of prudence and discretion which rested with the judges to exercise." *State v. Gallegos*, 2007-NMSC-007, ¶ 10, 141 N.M. 185, 152 P.3d 828 (alteration, omission, internal quotation marks, and citation omitted). Following the common law, our joinder rule was originally discretionary. *See* NMSA 1953, § 41-23-10 (1972) (Vol. 6, 2d. Rep., 1975 Pocket Supp.) (providing that "[t]wo . . . or more offenses *may* be joined" (emphasis added)). In 1979, our Supreme Court exercised its supervisory powers to change our joinder rule from permissive to mandatory, recognizing "that requiring prosecutors to get their facts straight, their theories clearly in mind and trying all charges together has the salutary effect of avoiding prejudice to the defendant[,]" as well as our "distaste for piecemeal prosecutions." *Gallegos*, 2007-NMSC-007, ¶¶ 11, 14 (alteration, internal quotation marks, and citation omitted). As a result, our joinder rule, embodied in Rule 5-203(A), now provides:

> Two or more offenses *shall* be joined in one complaint, indictment or information with each offense stated in a separate count, if the offenses, whether felonies or misdemeanors or both:
>
> > (1)  are of the same or similar character, even if not part of a single scheme or plan; or

> (2)    are based on the same conduct or on a series of acts either connected together or constituting parts of a single scheme or plan.

(Emphasis added.)

**{11}**    In *State v. Gonzales*, 2013-NMSC-016, 301 P.3d 380, our Supreme Court first answered the question of what was the proper remedy for the state's failure to join offenses under Rule 5-203(A). In *Gonzales*, the defendant drove while intoxicated and crashed her vehicle, killing a child in another vehicle. 2013-NMSC-016, ¶ 1. The state charged the defendant with, among other things, intentional and negligent child abuse. *Id.* ¶ 2. Prior to trial, the district court asked the state why it did not charge vehicular homicide in the alternative to the child abuse charges. *State v. Gonzales*, 2011-NMCA-081, ¶ 6, 150 N.M. 494, 263 P.3d 271, *aff'd on other grounds*, 2013-NMSC-016, ¶ 5. The prosecutor could not answer the question at first, "adding only that she wished they had charged the alternative vehicular homicide just to be safe." *Gonzales*, 2013-NMSC-016, ¶ 6 (alteration and internal quotation marks omitted). Nonetheless, the prosecutor went on to state that "[the] decision to charge [the d]efendant only with child abuse and not vehicular homicide was intentionally undertaken as an exercise of [the state's] discretion." *Gonzales*, 2011-NMCA-081, ¶ 6. Thus, at no point did the state pursue vehicular homicide charges against the defendant. *Id.* The defendant was eventually convicted of negligent child abuse and appealed. *See id.* ¶ 7.

**{12}**    On appeal, this Court reversed the conviction for lack of substantial evidence that "[the d]efendant's behavior endangered a particular child that was foreseeable at the time of the accident." *Id.* ¶ 32. We further held that principles of double jeopardy barred the state from prosecuting the defendant for vehicular homicide. *Id.* ¶ 33. On certiorari, our Supreme Court affirmed the determination that the State was barred from bringing a new charge of vehicular homicide. *See Gonzales*, 2013-NMSC-016, ¶ 3. However, the Court based its holding on Rule 5-203(A) rather than double jeopardy. *Gonzales*, 2013-NMSC-016, ¶¶ 26, 34. Acknowledging that it was raising the rule sua sponte, the Court observed that double jeopardy and compulsory joinder are "two sides of the same coin. Joinder is designed to protect a defendant's double[ ]jeopardy interests where the state initially declines to prosecute him for the present offense, electing to proceed on different charges stemming from the same criminal episode." *Id.* ¶ 26 (alteration, internal quotation marks, and citation omitted). The Court further observed, "The purpose of a compulsory joinder [rule], viewed as a whole, is twofold: (1) to protect a defendant from the governmental harassment of being subjected to successive trials for offenses stemming from the same criminal episode; and (2) to ensure finality without unduly burdening the judicial process by repetitious litigation." *Id.* (alteration, internal quotation marks, and citation omitted).

**{13}**    Examining Rule 5-203(A), the Court emphasized, "Our rules of criminal procedure require that similar offenses be joined in one prosecution and not be brought piecemeal by way of sequential trials. . . . The rule is mandatory; it is not a discretionary or permissive rule; it demands that the [s]tate join certain charges." *Gonzales*, 2013-

NMSC-016, ¶ 25 (internal quotation marks and citation omitted). Applying Rule 5-203(A) to the facts of the case, the Court held that vehicular homicide and child abuse were "two crimes based on the same conduct—[the d]efendant's intoxicated driving resulting in death to the victim[.]" *Gonzales*, 2013-NMSC-016, ¶ 25 (internal quotation marks omitted); *see* Rule 5-203(A)(2). Accordingly, the Court concluded that "[t]he [s]tate had no choice but to join these two offenses in one complaint, indictment or information, if it wanted to pursue them both." *Id.*; *see* Rule 5-203(A).

**{14}** In considering the proper remedy for the state's failure to join the defendant's charges, the Court observed,

> [w]hile the rule does not specify a remedy, we clearly intended that the rule have force. It would make little sense to have a mandatory rule with no method of enforcement; we would render it merely permissive. A bar against a subsequent prosecution on charges that should have been joined under Rule 5-203(A) is the only effective remedy to enforce the mandatory nature of the rule.

*Gonzales*, 2013-NMSC-016, ¶ 30. The Court went on to examine the state's actions, noting, "[t]his is not a case in which the charge the [s]tate now seeks to bring, vehicular homicide, was unknown at the time [the d]efendant was indicted." *Id.* ¶ 32. Rather, the State made deliberate, knowing decisions not to join the vehicular homicide to the pending child abuse charge, electing to pursue an "all-or-nothing trial strategy"—a strategy which the Court noted had a potentially "coercive effect" on jury deliberations. *Id.* ¶¶ 32-33 (internal quotation marks and citation omitted). In light of this, the Court determined that the state's failure to join the vehicular homicide charge in the first proceeding barred any subsequent prosecution for vehicular homicide. *Id.* ¶ 34.

## B.    Defendant Waived His Claim to Compulsory Joinder

**{15}** Unlike some other jurisdictions' compulsory joinder rules, Rule 5-203(A) is silent as to whether the defendant may waive his right to have charges joined under the rule. *Compare, e.g.*, W. Va. R. Crim. P. 8(a)(2) (1996) ("Any offense required by this rule to be prosecuted by a separate count in a single prosecution cannot be subsequently prosecuted *unless waived by the defendant.*" (emphasis added)), *with* Rule 5-203(A). Although our courts have previously determined that a defendant may waive an *improper joinder* claim under Rule 5-203(A) by not raising the issue prior to trial, *see State v. Paiz*, 2011-NMSC-008, ¶ 13, 149 N.M. 412, 249 P.3d 1235, whether a defendant can waive a *failure to join claim* by failing to request joinder appears to be an issue of first impression. Finding no New Mexico law on point, we turn to other jurisdictions with compulsory joinder rules for guidance.

**{16}** *People v. Bossert*, 722 P.2d 998 (Colo. 1986) (en banc) is particularly instructive. At the time *Bossert* was decided, Colorado had a compulsory joinder rule providing:

> If several offenses are known to the district attorney at the time of commencing the prosecution and were committed within his judicial district, all such offenses upon which the district attorney elects to proceed must be prosecuted by separate counts in a single prosecution if they are based on the same act or series of acts arising from the same criminal episode. Any such offense not thus joined by separate count cannot thereafter be the basis of a subsequent prosecution.

*Id.* at 1011 (citation omitted)).[2] In *Bossert*, the state filed three cases against the defendant, two of which were tried together. *Id.* at 1000. In November 1981 the state brought the first case charging the defendant with a single count of unlawful possession of an altered motor vehicle part. *Id.* at 1000-01. One month later, the state brought a separate case charging the defendant with another count of unlawful possession of an altered motor vehicle part. *Id.* at 1001. One year later, the state brought a third case charging the defendant with three counts of felony theft by receiving and four counts of unlawful possession of altered motor vehicle parts. *Id.* at 1002. The first case proceeded to trial in May 1983, resulting in the defendant's conviction for the one count of unlawful possession. *Id.* at 1001. The latter two cases were tried jointly seven months later, resulting in a mixed verdict. *Id.* at 1002.

**{17}** Defendant appealed his convictions from all three cases, challenging the constitutionality of his unlawful possession charges. *Id.* at 1000. While the defendant's appeals were pending, the Colorado Supreme Court granted the defendant's motion for limited remand to the trial court to permit him to file a motion to dismiss one of the latter-tried cases because the prosecution failed to join that case with the first. *Id.* at 1011. Following the trial court's determination on remand that the state violated the compulsory joinder rule, the Colorado Supreme Court, sitting en banc, determined that despite the joinder rule's mandatory language and the absence of a provision concerning waiver, the defendant waived his claim to compulsory joinder because he failed to raise the issue before the second trial. *Id.* at 1011-12.

**{18}** In arriving at this conclusion, the court noted, "Although the constitutional proscriptions against double jeopardy form the basis of the compulsory joinder rule, the rule is broader than the constitutional limitation. . . . Compulsory joinder is designed to protect the accused against the oppressive effect of sequential prosecutions and to conserve judicial and legal resources that otherwise would be wasted[.]" *Id.* at 1011 (omission, internal quotation marks, and citations omitted). The court acknowledged that dismissal for failure to join was proper in cases where the defendant raises the issue prior to the beginning of the second trial because it "further[ed] the goals of compulsory joinder[.]" *Id.* Nonetheless, the court reasoned, "where . . . the defendant does not raise the issue of joinder until well after the conclusion of the second trial, neither of the public

---

[2]Colorado's compulsory joinder rule and statute have since been amended to expressly provide that a defendant waives his or her right to compulsory joinder by failing to object prior to the time jeopardy attaches in the first trial if the defendant (or his or her counsel) knows of additional pending prosecutions required to be joined at the time. *See* Colo. Rev. Stat. Ann. § 18-1-408(e)(2) (2000); Colo. R. Crim. P. 8(a)(1) (2003).

policy reasons for the compulsory joinder rule would be served [by dismissal]—the harm, if any, has occurred." *Id.*

**{19}** The court went on to speculate that the defendant determined that it was "strategically preferable to keep the single charge in [the first trial] separate rather than risk the consequences of jury knowledge of the other eleven counts in [the combined second trial]." *Id.* at 1012. Nonetheless, the court found the defendant's reasons irrelevant and concluded that its compulsory joinder rule "imposed no jurisdictional bar to the defendant's conviction in . . . the second trial." *Id.* Taking note of the American Bar Association Standards for Criminal Justice's recommendation that "[a] defendant who has been tried for one offense may thereafter move to dismiss any additional offense based upon the same conduct or the same criminal episode. . . . *The motion to dismiss must be made prior to the second trial*[,]" *id.* at 1012 n.23 (emphasis added) (internal quotation marks and citation omitted), the court concluded the defendant waived his claim to compulsory joinder because he failed to raise the issue "prior to the time at which jeopardy attache[d] in the second prosecution[.]" *Id.* at 1012.

**{20}** Cases from other jurisdictions with compulsory joinder rules without explicit waiver provisions reveal similar results. *See, e.g.*, *State v. Soule*, 2002 ME 51, ¶¶ 4, 10, 794 A.2d 58, 60-61 (holding that the defendant waived the protections of the compulsory joinder rule when he failed to object to proceeding to a second trial on charges arising out of the same criminal episode); *Commonwealth v. Green*, 335 A.2d 493, 497 (Pa. Super. Ct. 1975) ("It is apparent that a defendant who is aware of the charges against him can thus waive his statutory right to have them all brought in a single prosecution. . . . The intent of the statute to avoid magnifying an incident of criminal behavior out of proportion, both in terms of hardship to the individual and prejudice to his case, is not lost when an informed defendant chooses of his own to go the route of multiple trials.").

**{21}** We are persuaded by the logic of *Bossert* and these other jurisdictions. Like these jurisdiction's joinder rules, Rule 5-203(A) contains mandatory language and does not include a provision concerning waiver by the defendant. *Compare, e.g.*, Colo. Rev. Stat. § 18-1-408(2), *with* Rule 5-203(A). Likewise, the purpose of our rule is to protect defendants from being subjected to successive trials for offenses stemming from the same criminal episode, as well as avoid unduly burdening the judicial process by repetitious litigation. *See Gonzales*, 2013-NMSC-016, ¶ 26. These policies are not furthered, however, when the defendant does not raise the issue of joinder until after the second trial has taken place because "the harm, if any, has [already] occurred." *Bossert*, 722 P.2d at 1011. Accordingly, we hold that Defendant waived his right to have the charges joined under Rule 5-203(A) by failing to raise the issue before jeopardy attached in *Jackson II*.[3]

---

3Because Defendant did not raise the issue of joinder at any point during the proceedings below, we leave open the question of whether a defendant who has knowledge of other pending charges waives his rights under Rule 5-203(A) if he fails to request joinder before jeopardy attaches in the first trial.

**{22}** Relying on *Gonzales*, Defendant nevertheless contends that review is proper here "in the same way that double jeopardy challenges can be brought for the first time on appeal." Defendant's reliance is misplaced. Although compulsory joinder and double jeopardy are closely related, *see Gonzales*, 2013-NMSC-016, ¶ 26, the right to joinder under Rule 5-203(A) is not the same as the constitutional guarantee to be free from double jeopardy. *See Bossert*, 722 P.2d at 1011 ("Although the constitutional proscriptions against double jeopardy form the basis of the compulsory joinder rule, the rule is broader than the constitutional limitation[.]" (citation omitted)). The double jeopardy clause protects against successive prosecutions for the same offense. *See State v. Silvas*, 2015-NMSC-006, ¶ 8, 343 P.3d 616 ("Double jeopardy protects against multiple punishments for the same offense."). The double jeopardy clause does not, however, require the State to join in a single proceeding all charges of "same or similar character" or "based on the same conduct or on a series of acts either connected together or constituting parts of a single scheme or plan." Rule 5-203(A); *see United States v. Sessa*, 125 F.3d 68, 73 (2d Cir. 1997) (stating that "the [d]ouble [j]eopardy [c]lause neither forbids successive prosecutions for different offenses nor requires the government to join all possible charges arising from a course of conduct in a single indictment"); *Lowery v. Estelle*, 696 F.2d 333, 342 (5th Cir. 1983) ("The double jeopardy clause does not require the state to join in a single criminal proceeding all charges arising from one criminal episode[.]").

**{23}** Moreover, we do not believe *Gonzales* compels this Court to dismiss Defendant's charges stemming from *Jackson II*, as *Gonzales* arose out of an entirely different procedural posture. There, the state declined to charge the defendant with the vehicular homicide charge and only decided to pursue the charge after trying and losing on the child abuse charge on appeal. *See Gonzales*, 2013-NMSC-016, ¶ 12. In contrast, the State, here, filed all of the charges against Defendant at the same time. Accordingly, this case—unlike *Gonzales*—does not fall squarely within the scenario against which Rule 5-203(A) is intended to protect (i.e., "where the state initially declines to prosecute [a defendant] for the present offense, electing to proceed on different charges stemming from the same criminal episode"). *Gonzales*, 2013-NMSC-016, ¶ 26 (alteration, internal quotation marks, and citation omitted). Additionally, *Gonzales* is distinguishable in that the defendant in that case complained that a subsequent trial for vehicular homicide would violate her double jeopardy rights *before* any additional trial took place, whereas here, Defendant failed to raise the issue until well after the second trial had completed. *See Gonzales*, 2011-NMCA-081, ¶ 33.

## C.     Failure to Join Did Not Constitute Fundamental Error

**{24}** Defendant argues that even if he was required to raise the issue of joinder below, the State's failure to join *Jackson I* and *Jackson II* constituted fundamental error because it allowed the State to "paint[] two very different versions of what supposedly happened between [Defendant] and [Victim] between April 4, 2015 and April 10, 2015— without ever having to reconcile the inconsistencies . . . [or] commit to one theory of what happened that week[.]" *See State v. Turner*, 2017-NMCA-047, ¶ 60, 396 P.3d 184 ("The doctrine of fundamental error applies only under exceptional circumstances and

only to prevent a miscarriage of justice. Fundamental error must go to the foundation of the case or take from the defendant a right which was essential to his defense and which no court could or ought to permit him to waive." (internal quotation marks and citations omitted)). In support of his argument, Defendant points to several inconsistencies in Victim's testimony in *Jackson I* and *Jackson II* as to how long she was confined in her house following the April 4 incident, thus calling into question whether Defendant was only guilty of one continuing kidnapping. As we discuss below, however, there was substantial evidence of two separate kidnappings, despite any inconsistencies in Victim's testimony, and therefore, Defendant's right to be free from double jeopardy was not violated.

{25}    Defendant also points out that Victim's mother testified in *Jackson I* that she saw Victim the day before the April 10 incident and did not notice any injuries at that time, and that there was no evidence that Victim had the injuries she sustained in the April 4 incident when she went to the hospital following the April 10 incident. Yet, Defendant fails to explain—nor do we see—how these inconsistencies rise to the level of fundamental error. *See State v. Salas*, 1999-NMCA-099, ¶ 13, 127 N.M. 686, 986 P.2d 482 (stating that it is for the jury to resolve conflicts in the evidence and determine where the weight and credibility lie). Nor does Defendant explain how he could not point out these inconsistencies in *Jackson II* by calling Victim's mother as a witness or reviewing Victim's medical treatment following the attacks. We, therefore, do not address this argument any further. *See State v. Guerra*, 2012-NMSC-014, ¶ 21, 278 P.3d 1031 (explaining that appellate courts are under no obligation to review unclear or undeveloped arguments); *State v. Astorga*, 2016-NMCA-015, ¶ 5, 365 P.3d 53 ("The burden of demonstrating fundamental error is on the party alleging it, and the standard of review for reversal for fundamental error is an exacting one." (internal quotation marks and citations omitted)). Accordingly, Defendant has failed to demonstrate fundamental error (if there was any error at all) in not joining the charges in *Jackson I* and *Jackson II*.

## II.    Double Jeopardy

{26}    Defendant next raises several double jeopardy arguments. First, Defendant raises a "unit of prosecution" claim, arguing that his two convictions for kidnapping in *Jackson I* and *Jackson II* violate his right to be free from double jeopardy. Second, Defendant raises two "double description" claims, arguing that his convictions in *Jackson II* for kidnapping and CSP II, as well as his convictions for CSC and aggravated battery violate double jeopardy. We address each argument in turn.

## Standard of Review

{27}    Double jeopardy protects against multiple punishments for the same offense. *See Swafford v. State*, 1991-NMSC-043, ¶¶ 7-8, 112 N.M. 3, 810 P.2d 1223. "Multiple punishment problems can arise from both 'double[]description' claims, in which a single act results in multiple charges under different criminal statutes, and 'unit[]of[]prosecution' claims, in which an individual is convicted of multiple violations of

the same criminal statute." *State v. Bernal*, 2006-NMSC-050, ¶ 7, 140 N.M. 644, 146 P.3d 289. Appellate courts "generally review double jeopardy claims de novo." *State v. Rodriguez*, 2006-NMSC-018, ¶ 3, 139 N.M. 450, 134 P.3d 737. "However, where factual issues are intertwined with the double jeopardy analysis, we review the [district] court's fact determinations under a deferential substantial evidence standard of review." *Id.* Under such circumstances, "we view the evidence in the light most favorable to the verdict and resolve all conflicts and indulge all inferences in favor of upholding the verdict." *State v. McClendon*, 2001-NMSC-023, ¶ 3, 130 N.M. 551, 28 P.3d 1092.

## A.    Unit of Prosecution Claim

**{28}**    Defendant first claims that his convictions for kidnapping in *Jackson I* and *Jackson II* violate double jeopardy because there was only evidence of a single, continuing kidnapping. Conversely, the State contends that Victim's testimony from both cases established two separate kidnappings. Although Victim's testimony in the two cases appeared inconsistent at one point, we conclude that there was sufficient evidence of two distinct kidnappings such that Defendant's kidnapping convictions do not violate double jeopardy.

**{29}**    Because we are examining multiple convictions under the same statute, we apply a unit of prosecution analysis, which consists of a two-step inquiry to discern "whether the [L]egislature intended punishment for the entire course of conduct or for each discrete act." *Swafford*, 1991-NMSC-043, ¶ 8. In order to do this, we first "analyze the statute to determine whether the Legislature has defined the unit of prosecution and, if the statute spells out the unit of prosecution, then the court follows that language and the inquiry is complete." *State v. Olsson*, 2014-NMSC-012, ¶ 18, 324 P.3d 1230. If the unit of prosecution is not clear, we proceed to the second step to "determine whether [the] defendant's acts are separated by sufficient indicia of distinctness to justify multiple punishments." *State v. Swick*, 2012-NMSC-018, ¶ 33, 279 P.3d 747 (internal quotation marks and citation omitted). In making this determination, we look at a number of factors, including: "(1) temporal proximity of the acts; (2) location of the victim(s) during each act; (3) existence of an intervening event; (4) sequencing of acts; (5) [the] defendant's intent as evidenced by his conduct and utterances; and (6) the number of victims." *State v. Demongey*, 2008-NMCA-066, ¶ 10, 144 N.M. 333, 187 P.3d 679 (internal quotation marks and citation omitted). Although this Court has previously stated that "the unit of prosecution [for kidnapping] is clear: a kidnapping begins when the victim is initially confined and ends when the victim is released[,]" we have found it necessary to proceed to the second step of analysis to "determine if the confinement was continuous or if there were individual instances of confinement that were separated by sufficient indicia of distinctness[.]" *State v. Dombos*, 2008-NMCA-035, ¶¶ 12-13, 143 N.M. 668, 180 P.3d 675.

**{30}**    Defendant claims that there was only evidence of a single, continuing kidnapping between April 4 and April 10, not two discrete kidnappings occurring on each of those dates. In support of this argument, Defendant appears to rely on Victim's testimony given during cross-examination in *Jackson II*, in which Victim testified that she could not

leave her house following the April 4 incident, as well as Victim's apparent confirmation during cross-examination that "[it was her] testimony that [Defendant] didn't leave the house at all over the next ten days [following the April 4 incident.]"

**{31}** While Victim's confirmation on cross-examination in *Jackson II* that Defendant did not leave her house for the ten days following the April 4 incident  was inconsistent with Victim's testimony in *Jackson I* that Defendant came over to her house on April 10, our review requires us to "resolve all conflicts and indulge all inferences in favor of upholding the verdict." *McClendon*, 2001-NMSC-023, ¶ 3; *see State v. Urioste*, 2011-NMCA-121, ¶ 19, 267 P.3d 820 ("Our primary concern is to ensure that each act supporting [a d]efendant's separate convictions was supported by sufficient evidence."). Resolving this conflict in Victim's testimony in favor of upholding the verdicts, we conclude that Victim's testimony from both *Jackson I* and *Jackson II*, as a whole, reveals sufficient evidence of two separate kidnappings.

**{32}** Although Victim's testimony regarding what happened between April 4 and April 10 was sparse, Victim testified in *Jackson I* that Defendant called her on April 10 and requested to come over to her house to collect some of his belongings. It thus stands to reason that Defendant had left Victim's house some time before April 10. Otherwise, he would not have needed to call Victim. It similarly stands to reason that Defendant terminated his intent to restrain Victim by freeing her before April 10, given that he requested permission from her to come over. Additionally, when defense counsel asked Victim in *Jackson II* if Defendant ever left the house on April 4, she responded, "He didn't leave until that day I took off running from him[,]"suggesting that Defendant left the house on April 10—which would be consistent with her testimony in *Jackson I*. What's more, Victim's testimony indicated that Defendant did not attempt to confine Victim on April 10 until she "took off running" after Defendant hit her during an argument.

**{33}** Hence, although Victim and location of Defendant's kidnappings overlap, there was sufficient evidence that the two kidnappings were separated by, at a minimum, Defendant's departure from Victim's house and his battery upon Victim, coupled with Defendant's termination of his intent to restrain Victim sometime between April 4 and April 10. This constituted sufficient indicia of distinctness between the individual instances of confinement, and, as a result, Defendant's two convictions for kidnapping do not violate double jeopardy. *See Dombos,* 2008-NMCA-035, ¶¶ 3-4, 13 (concluding that the defendant's convictions for kidnapping and false imprisonment of the same victim in the same location did not violate double jeopardy because the individual instances of confinement "were separated by days; intervening events that included consensual sex, drinking, and daily activities; and terminations of the intent to restrain").

## B.    Double Description Claims

**{34}** We now turn to Defendant's double description arguments. For double description claims, we apply the two-part test set forth in *Swafford*. We first ask "whether the conduct underlying the offenses is unitary, i.e., whether the same conduct

violates both statutes." 1991-NMSC-043, ¶ 25. "When determining whether [a d]efendant's conduct was unitary, we consider whether [a d]efendant's acts are separated by sufficient indicia of distinctness." *State v. DeGraff*, 2006-NMSC-011, ¶ 27, 139 N.M. 211, 131 P.3d 61 (internal quotation marks and citation omitted). Like our unit of prosecution analysis, "[we] may consider as indicia of distinctness the separation of time or physical distance between the illegal acts, the quality and nature of the individual acts, and the objectives and results of each act." *State v. Mora*, 2003-NMCA-072, ¶ 18, 133 N.M. 746, 69 P.3d 256 (internal quotation marks and citation omitted).

**{35}** "If [the defendant's conduct] is unitary, we [then] consider whether it was the Legislature's intent to punish the two crimes separately." *Swick*, 2012-NMSC-018, ¶ 11. "To determine legislative intent, we look first to the language of the statute." *Silvas*, 2015-NMSC-006, ¶ 11. "Absent a clear expression of legislative intent, a court first must apply the *Blockburger* test to the elements of each statute." *Swafford*, 1991-NMSC-043, ¶ 30. "Under *Blockburger* [*v. United States*, 284 U.S. 299 (1932)], the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Swick*, 2012-NMSC-018, ¶ 12 (internal quotation marks and citation omitted).

**{36}** "If [the *Blockburger* analysis] establishes that one statute is subsumed within the other, the inquiry is over and the statutes are the same for double jeopardy purposes—punishment cannot be had for both." *Swafford*, 1991-NMSC-043, ¶ 30. On the other hand, "[i]f one statute requires proof of a fact that the other does not, then the Legislature is presumed to have intended a separate punishment for each statute without offending principles of double jeopardy." *Silvas*, 2015-NMSC-006, ¶ 12. "That presumption, however, is not conclusive and it may be overcome by other indicia of legislative intent[,]" *id.*¶ 13 (internal quotation marks and citation omitted), which "may be gleaned from the statutory schemes by identifying the particular evil addressed by each statute; determining whether the statutes are usually violated together; comparing the amount of punishment inflicted for a violation of each statute; and examining other relevant factors." *Swick*, 2012-NMSC-018, ¶ 13 (internal quotation marks and citation omitted).

## 1.    Kidnapping and CSP II

**{37}** Defendant contends that his convictions for kidnapping and two counts of CSP II in *Jackson II* violate double jeopardy. The State, in turn, argues that there was no double jeopardy violation because the conduct underlying Defendant's convictions for kidnapping and the two counts of CSP II was not unitary.

**{38}** "In specifically analyzing whether the conduct underlying kidnapping and CSP II . . . convictions is unitary, this Court has held that unitary conduct occurs when the prosecution bases its theory of kidnapping on the same force used to commit CSP II . . . even though there were alternative ways to charge the crime." *State v. Simmons*, 2018-NMCA-015, ¶ 26, 409 P.3d 1030 (alternations, internal quotation marks, and citation omitted). Here, Defendant does not appear to contend that the State premised its theory

for the kidnapping conviction on the same force used to commit the CSPs. Instead, Defendant—relying on *Simmons*—argues that because the jury instructions did not specify which acts formed the basis for the kidnapping charge, this Court must assume that the jury premised Defendant's conviction for kidnapping on the same force used to commit the CSPs. *See id.* ¶ 27 ("When the conduct underlying two convictions could be unitary under the facts, but we are unsure if the jury relied on that unitary conduct for both convictions, we nevertheless assume for the purposes of our double jeopardy analysis that the conduct was unitary because one of the options/alternatives/scenarios is legally inadequate.").

**{39}** Defendant's reliance is misplaced. In *Simmons*, this Court was unable to rule out the possibility that the jury found that the defendant accomplished the kidnapping through the same force used to commit the acts of CSP, given the vague jury instructions provided. *See id.* In contrast, the jury in this case was instructed to find, among other things, that "[t]he restraint or confinement [used to accomplish the kidnapping] was not . . . merely incidental to the commission of a [CSP.]" Thus, *Simmons* is distinguishable, as the jury necessarily relied on distinct conduct for Defendant's kidnapping conviction. We, therefore, need not assume that the conduct underlying Defendant's convictions for kidnapping and the two counts of CSP was unitary.

**{40}** The State made clear in closing that it based its theory of kidnapping and the CSPs on different forces. The State argued, "Defendant kidnapped [Victim]. He restrained her when [he] grabbed her by the hair and forced her into that bathroom." Victim's testimony supported this theory. Victim testified that Defendant hit her and told her to go into the bathroom. And when Victim refused, Defendant dragged her by her hair into the bathroom. At that point, the crime of kidnapping was complete, although continuing. *See State v. Dominguez*, 2014-NMCA-064, ¶ 10, 327 P.3d 1092 ("The crime of kidnapping is complete when the defendant, with the requisite intent, restrains the victim, even though the restraint continues through the commission of a separate crime."); *see also State v. Jacobs*, 2000-NMSC-026, ¶ 24, 129 N.M. 448, 10 P.3d 127 ("[T]he key to finding the restraint element in kidnapping, separate from that involved in [CSP], is to determine the point at which the physical association between the defendant and the victim was no longer voluntary.").

**{41}** It was not until after Defendant had completed the kidnapping that Defendant put "all his weight" on Victim in the bathroom, forced her pants off, and committed the first act of CSP by sodomizing Victim with a stick, and the second act of CSP by forcing her to perform fellatio. *See State v. Montoya*, 2011-NMCA-074, ¶ 31, 150 N.M. 415, 259 P.3d 820 ("Sufficient indicia of distinctness exist when one crime is completed before another, and also when the conviction is supported by at least two distinct acts or forces, one which completes the first crime and another which is used in conjunction with the subsequent crime." (internal quotation marks and citation omitted)). Given Victim's testimony, the jury could have reasonably inferred an independent factual basis for Defendant's conviction for kidnapping and the CSPs. *See Urioste*, 2011-NMCA-121, ¶ 28 (affirming on the basis "that the jury could reasonably have inferred an

independent factual basis for all three of [the d]efendant's convictions"). Because we conclude that Defendant's conduct was not unitary, Defendant's convictions for kidnapping and two counts of CSP II do not violate double jeopardy.

**2.      CSC and Aggravated Battery**

**{42}**    Next, Defendant contends that his convictions for felony aggravated battery against a household member, as charged in count four, and his conviction for CSC violate double jeopardy. Although we agree with Defendant that the conduct underlying the two convictions was unitary, we conclude that the Legislature intended to punish the two crimes separately.

**{43}**    CSC is defined as "the unlawful and intentional touching of or application of force, without consent, to the unclothed intimate parts of another who has reached his eighteenth birthday[]" and constitutes a fourth degree felony "when the perpetrator is armed with a deadly weapon." Section 30-9-12(A), (C)(3). Consistent with UJI 14-915 NMRA, the jury was instructed to find Defendant guilty of CSC if they determined, in relevant part, that Defendant (1) "touched or applied force to the unclothed vagina of [Victim] without [Victim's] consent"; and (2) "was armed with and used a knife[.]" Aggravated battery against a household member is defined as "the unlawful touching or application of force to the person of a household member with intent to injure that person or another" and constitutes "a third degree felony if the aggravated battery . . . is committed . . . with a deadly weapon." Section 30-3-16(A), (C)(2). In order to find Defendant guilty of felony aggravated battery against a household member, as charged in count four, the jury was instructed to find, in relevant part, that Defendant: (1) "touched or applied force to [Victim] with a knife"; (2) "intended to injure [Victim] or another"; and (3) "[Victim] was a household member of [D]efendant."

**{44}**    The State concedes the conduct underlying Defendant's convictions for felony aggravated battery against a household member and CSC was unitary. While we are not bound by the State's concession, *see State v. Tapia*, 2015-NMCA-048, ¶ 31, 347 P.3d 738, we agree. As the jury instructions demonstrate, both of Defendant's convictions were premised on Defendant touching Victim with a knife, and the only evidence of Defendant's use of a knife against Victim came from Victim's testimony that Defendant cut her vagina with a folding knife. *See State v. Franco*, 2005-NMSC-013, ¶ 11, 137 N.M. 447, 112 P.3d 1104 (presuming unitary conduct where the state's theory at trial relied on the same conduct to convict the defendant of two crimes).

**{45}**    Having concluded that the conduct was unitary, we turn to the second prong of our double jeopardy analysis to determine whether the Legislature intended to punish the two crimes separately. *Swick*, 2012-NMSC-018, ¶ 11. Because neither the aggravated battery against a household member statute nor the CSC statute expressly provide for multiple punishments, *see* § 30-9-12; § 30-3-16, we begin by applying the *Blockburger* test to determine whether each statutory provision requires proof of a fact which the other does not. *See Swafford*, 1991-NMSC-043, ¶ 30.

**{46}** As a preliminary matter, we note that the parties argue over whether we should apply the traditional or modified *Blockburger* test. *See State v. Ramirez*, 2016-NMCA-072, ¶ 18, 387 P.3d 266 ("When applying *Blockburger* to statutes that are vague and unspecific or written with many alternatives, we look to the charging documents and jury instructions to identify the specific criminal causes of action for which the defendant was convicted."). Nonetheless, we need not decide which test is appropriate because the result is the same either way. Both the aggravated battery against a household member and CSC statutes, as well as the jury instructions in this case, make clear that each crime requires proof of a fact which the other does not. The CSC statute, as well as the jury instructions require proof that Defendant touched or applied force to Victim's unclothed vagina without her consent, *see* § 30-9-12(A); UJI 14-915—a fact which is not required for aggravated battery against a household member. *See* § 30-3-16(A), (C). Likewise, both the aggravated battery against a household member statute and jury instructions require proof that Victim was a member of Defendant's household, *see id.*, a fact which was not required for CSC. *See* § 30-9-12(A); UJI 14-915.

**{47}** Defendant argues that the elements of aggravated battery against a household member were subsumed within the CSC charge because the State relied on the same facts and the same intent to establish both counts (i.e., Defendant's cutting of Victim's vagina). We disagree. That Victim happened to also be a household member of Defendant's does not alter the State's legal theory for CSC, which only required that Defendant commit the sexual offense on "another." Section 30-9-12(A); *cf. State v. Gutierrez*, 2012-NMCA-095, ¶ 16, 286 P.3d 608 ("That 'the person' referred to in the robbery statute was [the victim], who happened to also be a household member based on her intimate relationship with [the d]efendant, does not alter the [s]tate's legal theory of robbery. That theory simply required identification of a 'person,' not the showing of any particular relationship between 'the person' and [the d]efendant." (quoting NMSA 1978, § 30-16-2 (1973)).

**{48}** Similarly, that the part of Victim's body to which Defendant touched the knife happened to be her vagina, does not alter the State's legal theory for aggravated battery against a household member, which only required that Defendant touched *some part* of Victim with a knife. *See* § 30-3-16(A), (C). In other words, that the State used the same set of facts to establish a common element of both charges—in this case, the touching or applying of force to Victim with a knife—does not change the fact that each charge required proof of a fact which the other did not. Accordingly, a presumption arises that the Legislature intended a separate punishment for the violation of each statute without violating double jeopardy. *See Silvas*, 2015-NMSC-006, ¶ 12.

**{49}** This presumption is buttressed by the other indicia of legislative intent. While both statutes generally protect bodily integrity, they address distinct evils. *See Swafford*, 1991-NMSC-043, ¶ 32 n.7 (cautioning that too broad of an interpretation of societal interests "eviscerates the [L]egislature's intent to proscribe the narrower, distinct evils . . . by way of different statutory [provisions]")). On the one hand, the CSC statute protects individuals from unlawful intrusions into their "intimate parts." Section 30-9-12(A); *see State v. Williams*, 1986-NMCA-122, ¶ 9, 105 N.M. 214, 730 P.2d 1196 ("In defining

intimate parts, the CSC statute lists five separate protected areas: the genital area, groin, buttocks, anus and breast. We hold that the legislative intent was to protect the victim from intrusions to each enumerated part." (internal quotation marks omitted)). On the other hand, the battery against a household member statute protects against the use of force against a specific group of people (i.e., household members). *Gutierrez*, 2012-NMCA-095, ¶ 20.

**{50}**    Furthermore, it does not appear that "the statutes are usually violated together." *Swick*, 2012-NMSC-018, ¶ 13 (internal quotation marks and citation omitted). While some CSCs may be perpetrated by members of the victim's household, and some aggravated batteries on a household member may involve the application of force to the victim's "intimate parts," Defendant does not cite to—nor are we aware of—any authority that the two offenses are "usually" committed together. *See State v. Wyman*, 2008-NMCA-113, ¶ 6, 144 N.M. 701, 191 P.3d 559 ("Where a party cites no authority to support an argument, we may assume no such authority exists."). Finally, although violation of the two statutes results in differing degrees of felonies, *compare* § 30-9-12(C) (defining CSC as a fourth degree felony when armed with a deadly weapon), *with* § 30-3-16(C) (defining aggravated battery against a household member as a third degree felony when committed with a deadly weapon), this "difference in the quantum of punishment alone is insufficient to overcome other indicia of legislative intent." *State v. Caldwell*, 2008-NMCA-049, ¶ 19, 143 N.M. 792, 182 P.3d 775. For these reasons, we hold that the Legislature intended to punish CSC and aggravated battery on a household member separately, and consequently, Defendant's convictions do not violate double jeopardy.

### III.    Ineffective Assistance of Counsel

**{51}**    Defendant claims he suffered from ineffective assistance of counsel due to his counsel's failure to: (1) watch Defendant's recorded interview with police before trial, leading to the admission of otherwise inadmissible evidence; (3) move to join *Jackson I* and *Jackson II*; and (3) object to an investigating officer's testimony that a mark on Defendant's penis was consistent with a bite mark, as well as his testimony regarding domestic violence victims and their fear of retaliation. We address each argument in turn.

**{52}**     "In order to establish a prima facie case of ineffective assistance of counsel on appeal, [the d]efendant must demonstrate that his counsel's performance fell below that of a reasonably competent attorney and that he was prejudiced by his counsel's deficient performance." *State v. Uribe-Vidal*, 2018-NMCA-008, ¶ 25, 409 P.3d 992 (internal quotation marks and citation omitted). "In determining whether a particular counsel's performance was deficient, an appellate court should presume that the performance fell within a wide range of reasonable professional assistance[,]" and we will not find ineffective assistance if "we can conceive of a reasonable trial tactic which would explain the counsel's performance[.]" *State v. Roybal*, 2002-NMSC-027, ¶ 21, 132 N.M. 657, 54 P.3d 61 (internal quotation marks and citation omitted). However, even when we cannot conceive of such a tactic explaining counsel's actions, counsel's

deficient performance will not entitle a defendant to a new trial unless we determine, considering the totality of the evidence, that "there is a reasonable probability that, absent the errors, the fact[-]finder would have had a reasonable doubt respecting guilt." *Id.* ¶ 25 (internal quotation marks and citation omitted).

**{53}** "We review claims of ineffective assistance of counsel de novo." *State v. Pitner*, 2016-NMCA-102, ¶ 14, 385 P.3d 665 (internal quotation marks and citation omitted). "When an ineffective assistance claim is first raised on direct appeal, we evaluate the facts that are part of the record." *Roybal*, 2002-NMSC-027, ¶ 19. "If facts necessary to a full determination are not part of the record, an ineffective assistance claim is more properly brought through a habeas corpus petition[.]" *Id.*

## A. Failure to Watch Video Evidence

**{54}** Defendant first claims his counsel was ineffective in failing to watch a video recording of Defendant's interview with police before trial. The facts as relevant to this claim are as follows. On the first day of trial, outside of the presence of the jury, the State indicated that it sought to introduce a video recording of Defendant's interview with one of the investigating officers, Officer Rodriguez. Defense counsel objected to the introduction of the video because Defendant could be seen wearing an orange prison jumpsuit but stipulated to the admission of the audio. After the State pointed out that the video had been disclosed to Defendant for a substantial period of time and there had been no motions in limine filed regarding the video, the district court agreed that the issue should have been raised earlier and asked defense counsel if he had seen the video prior to that day. Defense counsel admitted that he had not seen the video but "was aware of it." The district court sustained defense counsel's objection and permitted the audio to be played.

**{55}** Officer Rodriguez testified about his investigation. During Officer Rodriguez's testimony, the State played the audio of his interview of Defendant. At one point during the interview, Defendant admitted hitting Victim and pulling her back into the house, breaking her cellphone in the process. When Officer Rodriguez clarified that Defendant was talking about the April 10 incident, defense counsel objected because Defendant was referring to facts from *Jackson I*. Additionally, defense counsel objected on the grounds of Defendant's "obvious level of intoxication" during the interview. But because defense counsel had already stipulated to the admission of the audio, the district court overruled defense counsel's objection and allowed the remainder of the audio to be played.

**{56}** Defendant argues that his counsel's failure to watch the video led to the introduction of evidence relating to *Jackson I*—namely Defendant's admission that he hit Victim and pulled her back into the house—which amounted to unrelated prior bad act evidence. *See* Rule 11-404(B) NMRA. Defendant also argues that had counsel watched the video before trial, he would have filed a pre-trial motion challenging the voluntariness of Defendant's statements made during the interview based on Defendant's "obvious intoxication." Although we cannot conceive of a reasonable trial

tactic for counsel's failure to watch the video of Defendant's interview before trial, Defendant cannot demonstrate sufficient prejudice to warrant a new trial. *See Roybal*, 2002-NMSC-027, ¶ 25.

**{57}** In regard to Defendant's first argument that counsel allowed the jury to hear evidence relating to the April 10 incident, we fail to see how there was a "reasonable probability" that, absent Defendant's objectionable statements, the jury would have had a reasonable doubt respecting Defendant's guilt. *Id.* Besides generally arguing that Defendant's statements were irrelevant and allowed the jury to consider that Victim's allegations "were part of a larger claim of abuse over the course of a week," Defendant fails to explain how the admission of his statements affected the jury's determination of his guilt, particularly in light of Victim's extensive testimony regarding Defendant's actions. "Given this lack of specificity, Defendant's allegation of prejudice amounts to a mere assertion[,]" which is insufficient to demonstrate prejudice. *State v. Torres*, 2005-NMCA-070, ¶ 18, 137 N.M. 607, 113 P.3d 877; *see In re Ernesto M., Jr.*, 1996-NMCA-039, ¶ 10, 121 N.M. 562, 915 P.2d 318 ("An assertion of prejudice is not a showing of prejudice.").

**{58}** In regard to Defendant's second argument, we are unable to determine from the audio recording the level of Defendant's intoxication—the only indication of which comes from defense counsel's objection, which is not evidence. *See State v. Hall*, 2013-NMSC-001, ¶ 28, 294 P.3d 1235 ("The mere assertions and arguments of counsel are not evidence." (internal quotation marks and citation omitted)). Moreover, even if Defendant was intoxicated during his interview, his intoxication, alone, is insufficient to render his statements involuntary. *See State v. Montano*, 2019-NMCA-019, ¶ 17, ___ P.3d ___ ("[A d]efendant's intoxication, or state of mind, alone is insufficient to render a confession involuntary without accompanying police misconduct or overreaching."). Accordingly, Defendant cannot demonstrate either requirement of ineffective assistance of counsel for counsel's failure to move to suppress his interview. *See State v. Mosley*, 2014-NMCA-094, ¶ 20, 335 P.3d 244 ("Where . . . the ineffective assistance of counsel claim is premised on counsel's failure to move to suppress evidence, [the d]efendant must establish that the facts support the motion to suppress and that a reasonably competent attorney could not have decided that such a motion was unwarranted." (internal quotation marks and citation omitted)).

## B. Failure to Move for Joinder

**{59}** Next, Defendant claims his counsel was ineffective in failing to move for joinder of *Jackson I* and *Jackson II*. The record is undeveloped with respect to any reasons why defense counsel—who represented Defendant in both cases—would have thought it tactically wise to join the two for trial before the same jury. Yet, as the Colorado Supreme Court speculated in *Bossert*, it is possible that defense counsel, in this case, determined that it was "strategically preferable" to keep the cases separate in order to prevent the juries from learning of the facts pertaining to both incidents—facts which included disturbingly violent conduct by Defendant. 722 P.2d at 1012; *see Jacobs*, 2000-NMSC-026, ¶ 15 ("A defendant might be prejudiced if the joinder of offenses

permitted the jury to hear testimony that would have been otherwise inadmissible in separate trials."). Indeed, as noted earlier, defense counsel sought to exclude evidence relating to the April 10 incident (i.e., Defendant's comments during his interview with Officer Rodriguez) in *Jackson II*, suggesting that this was his intention. Given this, we cannot say that defense counsel was ineffective in failing to join the two cases. *See Roybal*, 2002-NMSC-027, ¶ 21 ("[I]f on appeal we can conceive of a reasonable trial tactic which would explain the counsel's performance, we will not find ineffective assistance.").

## C.     Failure to Object to Lay-Witness Testimony

**{60}**     Next, Defendant claims his counsel was ineffective in failing to object to Officer Rodriguez's testimony that a mark on Defendant's penis was consistent with Victim's claim that she bit Defendant's penis, which Defendant claims amounted to impermissible lay witness opinion. Defendant does not, however, develop any argument as to why it was improper for a lay witness to testify that a mark they observed on someone's body appeared consistent with a bite mark. *See State v. Winters*, 2015-NMCA-050, ¶ 11, 349 P.3d 524 ("[O]pinion testimony of lay witnesses is generally confined to matters which are within the common knowledge and experience of an average person." (internal quotation marks and citation omitted)); *see also State v. Holley*, 175 A.3d 514, 536 (Conn. 2018) ("[I]t was well within the trial court's discretion to determine that [the lay witness]'s testimony that [the defendant's accomplice]'s wounds appeared to be a bite mark, based on [the witness]'s personal observation and rational perception of [the defendant's accomplice]'s injuries, was more beneficial to the jury than a more abstract recitation or description of the size, location, and shape of the wound."). Accordingly, we decline to address Defendant's argument any further. *See State v. Dickert*, 2012-NMCA-004, ¶ 46, 268 P.3d 515 (declining to address the defendant's inadequately developed argument).

**{61}**     Defendant also contends counsel was ineffective because he did not object to Officer Rodriguez's testimony that abuse victims may be "free to leave" an abuser but not "free [to leave] without any consequences" because, in his experience investigating domestic violence, abusers usually try to find the victim, leading to "possibly another beating." Defendant claims that this amounted to impermissible lay witness opinion akin to diagnosing Victim with "battered woman syndrome." Yet Defendant again fails to develop his argument that Officer Rodriguez's brief testimony rose to the level of opinion requiring expert qualification or how the admission of the testimony prejudiced Defendant enough to warrant a new trial. As a result, we need not, and do not, address Defendant's argument any further. *See id.* ¶ 46.

**{62}**     In sum, Defendant fails to establish a prima facie case of ineffective assistance of counsel for any of his claims. Accordingly, his claims are more properly brought through a habeas corpus petition. *See Roybal*, 2002-NMSC-027, ¶ 19.

## IV.     Sufficiency of the Evidence

**{63}** Finally, Defendant contends that there was insufficient evidence to sustain his convictions. Defendant raises this argument, pursuant to *State v. Franklin*, 1967-NMSC-151, 78 N.M. 127, 428 P.2d 982, and *State v. Boyer* 1985-NMCA-029, 103 N.M. 655, 712 P.2d 1, which require appellate counsel to advance his argument even if the merits of the argument are questionable. Defendant summarily argues that there was insufficient evidence for his convictions because some of Victim's testimony lacked corroboration. Yet Defendant fails to develop this argument or even identify which convictions he is challenging or what essential elements lack substantial evidence. Nor does Defendant support his argument with any authority. For these reasons, we decline to address Defendant's sufficiency argument. *See State v. Vigil-Giron*, 2014-NMCA-069, ¶ 60, 327 P.3d 1129 ("[A]ppellate courts will not consider an issue if no authority is cited in support of the issue and that, given no cited authority, we assume no such authority exists."); *Dickert*, 2012-NMCA-004, ¶ 46.

**CONCLUSION**

**{64}** For the foregoing reasons, we conclude that Defendant waived his claim for joinder under Rule 5-203(A) because he failed to raise the issue prior to the second trial, and that failure to join did not constitute fundamental error. Finding Defendant's remaining double jeopardy, ineffective assistance of counsel, and sufficiency arguments unpersuasive or undeveloped, we affirm.

**{65}  IT IS SO ORDERED.**

**JACQUELINE R. MEDINA, Judge**

**WE CONCUR:**

**LINDA M. VANZI, Judge**

**JULIE J. VARGAS, Judge**