# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number: _____**

**Filing Date: <u>December 17, 2014</u>**

**NO. 32,864**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**JEREMY S. LUCERO,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF MCKINLEY COUNTY**
Grant L. Foutz, District Judge

Gary K. King, Attorney General
Paula E. Ganz, Assistant Attorney General
Santa Fe, NM

for Appellee

Law Offices of the Public Defender
Jorge A. Alvarado, Chief Public Defender
Tania Shahani, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**ZAMORA, Judge.**

{1}     Defendant Jeremy Lucero appeals his convictions for voluntary manslaughter, contrary to NMSA 1978, § 30-2-3(A) (1994), and aggravated battery, contrary to NMSA 1978, § 30-3-5(C) (1969). He argues that: (1) the district court erred in refusing a requested self-defense instruction as to the voluntary manslaughter and aggravated battery charges, (2) the district court erred in denying his requests for a mistrial, and (3) his convictions for aggravated battery and voluntary manslaughter arise from the same course of conduct and violate the prohibition against double jeopardy. We agree with Defendant that the self-defense jury instruction should have been given. Accordingly, we reverse and remand for a new trial. We address Defendant's remaining issues only to the extent they either have the potential of affording Defendant greater relief on appeal or they are likely to recur on retrial.

**I.     BACKGROUND**

{2}     Jean (aka Gene) Bateman (Victim) was an eighty-seven-year-old man who lived at the Ambassador Motel (the motel) in Gallup, New Mexico. He collected and traded weapons and kept a gun and a machete in his motel room.

{3}     Defendant had been with a friend in a different room at the motel throughout the night of November 22, 2010, and on the morning of November 23, 2010. Also on

that morning, he had argued loudly with his girlfriend in the parking lot and Victim observed the argument from his doorway, which was adjacent to the lot. After Defendant's girlfriend left, Victim asked Defendant about the argument and invited Defendant to his room. Defendant knew Victim socially because, at one point, Defendant, his girlfriend, and their children had also lived at the motel. The men talked near the door of Victim's room. Their interaction escalated into an argument. Defendant testified that he threatened to publicly share private details about Victim, the two exchanged words, and Victim struck Defendant in the head with his machete.

{4} Defendant further testified that after being struck, he "saw a star" and "kind of blacked out." He remembered pushing Victim back and the machete dropping. Defendant could not recall if there was a struggle for the machete. The next thing he remembered was that Victim stood up and retrieved a gun from under his pillow and pointed it at Defendant's face.

{5} As Victim had gone for the gun, Defendant picked up the machete from the floor. Defendant testified that when Victim pointed the gun at him, he was angry, confused, scared, and afraid for his life. Defendant did not remember swinging the machete, but testified that he remembered seeing a laceration on Victim's neck and blood everywhere, both Victim's and his own. Defendant took Victim's gun and fled in Victim's Jeep. Defendant wrecked the Jeep and walked to his aunt's house.

3

Defendant's aunt agreed to give him a ride back into town. As they were leaving, Defendant's girlfriend arrived. Defendant got out of the vehicle and went after his girlfriend with a gun in his hand. Defendant's aunt retrieved the gun, placed it under the seat of the vehicle, and called police. Law enforcement officers responding to the call discovered Victim's Jeep, retrieved the gun from under the seat where Defendant's aunt had put it, took Defendant into custody, and transported him to the hospital.

{6} Meanwhile, a motel employee discovered Victim on the floor of his motel room, injured and surrounded by blood. First responders to the motel observed that there was a great deal of blood on the carpet of Victim's room. Later testimony revealed that Victim had lost between 30 percent and 40 percent of his blood volume. Victim's throat had been cut, he had cuts on his arm, and a bump on his head.

{7} Victim was hospitalized. His injuries included lacerations on his neck, fractured ribs, lacerations on his arm, a fractured bone in his shoulder, and blunt force injuries to his head. Victim had a distinctive pattern on his forehead consistent with the pattern on the bottom of the shoes Defendant was wearing at the time of his arrest. The State's expert testified that the injury to Victim's head was consistent with Victim being stomped on with enough force to damage the blood vessels.

4

{8} Victim remained hospitalized, in critical condition and on a ventilator, until February 2011. While hospitalized, Victim suffered from pressure injuries, malnutrition, and pneumonia. After several months, and several attempts by Victim's doctors to take him off of the ventilator, the decision was made not to continue to resuscitate or intubate him. The autopsy concluded that the cause of Victim's death was the multiple traumatic injuries he had sustained.

{9} Defendant was charged with one count each of first degree murder, aggravated burglary, robbery, aggravated battery, and receiving or transferring stolen vehicles. Defendant was convicted of voluntary manslaughter, a lesser included offense of first degree murder, as well as all the other charges. This appeal followed.

## II. DISCUSSION

## A. The Self-Defense Instruction

{10} At the close of evidence at Defendant's trial, Defendant requested a self-defense jury instruction in accordance with UJI 14-5181 NMRA, which the district court refused to issue. Defendant contends that the district court's refusal to issue the instruction constitutes reversible error.

{11} "The propriety of denying a jury instruction is a mixed question of law and fact that we review de novo." *State v. Guerra*, 2012-NMSC-014, ¶ 13, 278 P.3d 1031 (internal quotation marks and citation omitted). "When considering a defendant's

requested instructions, we view the evidence in the light most favorable to the giving of the requested instructions." *State v. Swick*, 2012-NMSC-018, ¶ 60, 279 P.3d 747 (alteration, internal quotation marks, and citations omitted). "For a defendant to be entitled to a self-defense instruction . . . there need be only enough evidence to raise a reasonable doubt in the mind of a juror about whether the defendant lawfully acted in self-defense. If any reasonable minds could differ, the instruction should be given." *State v. Lucero*, 2010-NMSC-011, ¶ 11, 147 N.M. 747, 228 P.3d 1167 (omission in original) (internal quotation marks and citation omitted).

{12} An instruction on self-defense must be justified by evidence on all three elements of self-defense, which are: "(1) the defendant was put in fear by an apparent danger of immediate death or great bodily harm, (2) the killing resulted from that fear, and (3) the defendant acted reasonably when he or she killed." *State v. Rudolfo*, 2008-NMSC-036, ¶ 17, 144 N.M. 305, 187 P.3d 170 (internal quotation marks and citation omitted). When such evidence is presented, the defendant has an "*unqualified* right" to the instruction. *State v. Ellis*, 2008-NMSC-032, ¶ 15, 144 N.M. 253, 186 P.3d 245 (internal quotation marks and citation omitted).

{13} The first two elements, the apparent danger and the defendant's fear, are assessed subjectively, focusing "on the perception of the defendant at the time of the incident." *Rudolfo*, 2008-NMSC-036, ¶ 17 (internal quotation marks and citation

omitted). The reasonableness of the defendant's response in the face of the apparent danger and fear is assessed objectively. *See id.* (stating that "the third requirement is objective in that it focuses on the hypothetical behavior of a reasonable person acting under the same circumstances as the defendant." (internal quotation marks and citation omitted)).

{14} Evidence presented at trial did not conclusively establish the sequence of events that resulted in Victim's injuries. The forensic expert, Lawrence Renner, testified that it could not be determined to what extent the two men may have struggled against one another, what type of struggle took place, or how long the struggle may have lasted.

{15} Defendant testified that the violence began when Victim attacked him with the machete, delivering a blow to his head that caused him to black out. Though Defendant was unable to recall exactly what happened once he had control of the machete, he did testify that when Victim pointed a gun at his face, he was afraid for his life and that he was defending himself when he injured Victim.

{16} Several photographs admitted into evidence showed a significant gash on Defendant's forehead. Officers present when Defendant was taken into custody testified that he had a bleeding head wound and that he was transported to the hospital. Additionally, blood stains on the awning of Victim's doorway, determined

to be Defendant's blood, were consistent with Defendant's testimony that he had been struck with a machete.

{17} The State argues that Defendant's testimony that he was in danger and was in fear for his life lacks credibility. The State contends that the evidence of Victim's physical limitations and the condition of his room calls into question Defendant's testimony that Victim retrieved a gun and pointed it at him. The State also insists that at some point Victim was injured on the floor, no longer posing a threat to Defendant, so Defendant could not have been in actual fear. The State further argues that even if Defendant had perceived danger and felt actual fear, his response was not reasonable. The State relies on the theory that Defendant persisted in attacking Victim after Victim had fallen to the floor injured. This theory is based on testimony that the injuries to Victim's neck and head could have occurred while Victim was lying on the floor. However, the admitted evidence was conflicting and did not conclusively establish the sequence of events or what position Victim was in when he sustained each of his injuries.

{18} As a reviewing court, it is not within our purview to weigh evidence. *State v. Sutphin*, 1988-NMSC-031, ¶ 21, 107 N.M. 126, 753 P.2d 1314. That function is reserved for the trier of fact. *See State v. Johnson*, 1983-NMSC-043, ¶ 7, 99 N.M. 682, 662 P.2d 1349 (observing that conflicts in the evidence, including conflicts in

8

testimony among witnesses, are to be resolved by the trier of fact); *see generally State v. Salas*, 1999-NMCA-099, ¶ 13, 127 N.M. 686, 986 P.2d 482 (recognizing that the appellate court defers to the fact finder when weighing the credibility of witnesses and resolving conflicts in witness testimony). The admitted evidence was sufficient to raise an issue of fact with respect to the elements of a self-defense claim and conclude that the district court erred in refusing to instruct the jury accordingly.

**B. Double Jeopardy**

{19} Defendant argues that his convictions for aggravated battery and voluntary manslaughter violate the prohibition against double jeopardy because the convictions arise from the same course of conduct. "The Fifth Amendment of the United States Constitution prohibits double jeopardy and is made applicable to New Mexico by the Fourteenth Amendment." *Swick*, 2012-NMSC-018, ¶ 10. Because double jeopardy challenges are constitutional questions of law, we review them de novo. *State v. Melendrez*, 2014-NMCA-062, ¶ 5, 326 P.3d 1126, *cert. denied*, 2014-NMCERT-006, 328 P.3d 1188.

{20} The double jeopardy clause "functions in part to protect a criminal defendant against multiple punishments for the same offense." *Swick*, 2012-NMSC-018, ¶ 10 (internal quotation marks and citation omitted). There are two classifications of double jeopardy multiple-punishment cases: double-description cases, "where the

same conduct results in multiple convictions under different statutes"; and unit-of-prosecution cases, "where a defendant challenges multiple convictions under the same statute." *Id.* Here, Defendant's double jeopardy challenge raises a double-description issue because he challenges two convictions under different statutes for what he contends is the same conduct.

{21} Double-description claims involve a two-part analysis. *Swafford v. State*, 1991-NMSC-043, ¶ 25, 112 N.M. 3, 810 P.2d 1223. We first consider whether the conduct underlying the offenses is in fact the same, or unitary. *See id.*; *Melendrez*, 2014-NMCA-062, ¶ 7; *Swick*, 2012-NMSC-018, ¶ 11. If the conduct is not unitary, there is no double jeopardy violation. *Swick*, 2012-NMSC-018, ¶ 11. If the conduct is unitary, we look to the statutes at issue "to determine whether the [L]egislature intended to create separately punishable offenses." *Swafford*, 1991-NMSC-043, ¶ 25.

{22} When determining "whether a defendant's conduct was unitary, we consider . . . whether acts were close in time and space, their similarity, the sequence in which they occurred, whether other events intervened, and the defendant's goals for and mental state during each act." *State v. Franco*, 2005-NMSC-013, ¶ 7, 137 N.M. 447, 112 P.3d 1104. Where a defendant's acts are separated by sufficient indicia of distinctness, the conduct is not unitary. *State v. Urioste*, 2011-NMCA-121, ¶ 18, 267 P.3d 820. The proper inquiry "is whether the facts presented at trial establish that the

jury reasonably could have inferred independent factual bases for the charged offenses." *Franco*, 2005-NMSC-013, ¶ 7 (internal quotation marks and citation omitted).

{23} On appeal, the State asserts that Victim was injured as a result of two distinct attacks; one while Victim was upright and the other after he had fallen to the floor. The State contends that the wounds on Victim's arm and shoulder were sustained while Victim was standing and are sufficient to support the aggravated battery conviction, while the injuries to Victim's neck and head were sustained as Victim lay on the floor and are sufficient to support the voluntary manslaughter conviction.

{24} As we previously discussed, the admitted evidence did not establish the sequence or timing of Victim's injuries, nor did it conclusively establish how Victim was positioned when each of his injuries occurred. The evidence does not indicate whether there was an intervening event or a change in Defendant's intent during the course of the altercation. Moreover, the medical examiner testified that Victim's death was not specifically attributable to any of injuries, but rather to complications from multiple traumatic injuries. At trial, the State argued that the charge of aggravated battery was supported by the injuries to Victim's neck and arm and that Victim's death was attributable to all of his injuries.

11

{25} Based upon what was presented at trial, the jury could not have reasonably distinguished distinct factual bases for the voluntary manslaughter charge and the aggravated battery charge. As a result, we conclude that Defendant's conduct was unitary and turn to the question of whether the Legislature intended to create separate punishments for aggravated battery and voluntary manslaughter.

{26} In analyzing legislative intent, we look to the language of the statute. *State v. Frazier*, 2007-NMSC-032, ¶ 21, 142 N.M. 120, 164 P.3d 1. If multiple punishments are not clearly prescribed, we then apply the rule of statutory construction established in *Blockburger v. United States*, 284 U.S. 299 (1932). *Swafford*, 1991-NMSC-043, ¶ 11. Under *Blockburger*, "the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." 284 U.S. at 304.

{27} However, our Supreme Court has clarified that "the application of *Blockburger* should not be so mechanical that it is enough for two statutes to have different elements." *Swick*, 2012-NMSC-018, ¶ 21. Instead, "a complete double jeopardy analysis may require looking beyond facial statutory language to the actual legal theory in the particular case by considering such resources as the evidence, the charging documents, and the jury instructions." *State v. Montoya*, 2013-NMSC-020, ¶ 49, 306 P.3d 426.

{28} In *Swick*, the defendant "beat, stabbed, and slashed" his victims. *Swick*, 2012-NMSC-018, ¶ 26. This conduct formed the bases for both the aggravated battery and the attempted murder charges. The Court used the modified *Blockburger* approach to determine "whether the Legislature authorized multiple punishments under the statutes for attempted murder and aggravated battery with a deadly weapon for the same conduct." *Swick*, 2012-NMSC-018, ¶ 20. The Court rejected a mechanical comparison of each statutory element concluding that:

> Both statutes punish overt acts against a person's safety but take different degrees into consideration. The aggravated battery statute concerns itself with the intent to harm and the attempted murder statute concerns itself with the intent to harm fatally. . . . Even if we accept as true that different social harms may be addressed by each statute, *Swafford* explained that '[i]f the punishment attached to an offense is enhanced to allow for kindred crimes, these related offenses may be presumed to be punished as a single offense.'

*Id.* ¶ 29. Considering that the state had not asserted or shown independent factual bases for the aggravated battery and the attempted murder charges the Court held that "the aggravated battery elements were subsumed within the attempted murder elements. When this occurs, the double jeopardy prohibition is violated, and punishment cannot be had for both." *Id.* ¶ 27 (internal quotation marks and citation omitted).

{29} *Swick* also reaffirmed the principle that "when doubt regarding legislative intent remains, ambiguity must be resolved in favor of lenity." *Id.* ¶ 30 (internal

13

quotation marks and citation omitted). If reasonable minds can differ as to the Legislature's intent in punishing the crimes at issue, the rule of lenity should be applied. *Montoya*, 2013-NMSC-020, ¶ 51.

{30} Here, the State argues that the aggravated battery and voluntary manslaughter statutes are intended to be separately punishable because they proscribe different crimes with different elements. We reject this argument.

{31} Voluntary manslaughter is the unlawful killing of a human being without malice, committed upon a sudden quarrel or in the heat of passion. *See* § 30-2-3(A). Aggravated battery involves "the unlawful touching or application of force to the person of another with intent to injure that person[.]" Section 30-3-5(A). Though these statutes do consist of different elements, here, as in *Swick*, "[b]oth statutes punish overt acts against a person's safety but take different degrees into consideration." 2012-NMSC-018, ¶ 29.

{32} The State's attempt to characterize Defendant's actions as distinct and separately punishable on appeal is misguided. First of all, the evidence does not support the State's theory that Victim suffered two separate attacks. Second, the conduct supporting each of the charges was nearly indistinguishable. At trial, the theory of the State's case to support the aggravated battery charge was that Defendant sliced Victim's throat and arm. Its theory to support the voluntary manslaughter

14

charge was that Defendant sliced Victim's throat and arm, and stomped on his head. The aggravated battery is subsumed within the voluntary manslaughter. Applying the double jeopardy analysis as recently clarified by our Supreme Court, along with the rule of lenity, we conclude that Defendant's convictions for both crimes violate the prohibition against double jeopardy and cannot stand.

{33}     We recognize that the evidence presented on retrial may differ from that presented at the first trial, and that the double jeopardy analysis may be affected. However, the parties and the district court should keep the above analysis in mind in addressing any double jeopardy issues that may arise upon retrial.

**C.     Defendant's Motions for Mistrial**

{34}     Defendant contends that the court erred in denying his requests for a mistrial after several State witnesses referenced an alleged domestic violence incident, excluded by the court as prejudicial. We decline to address this issue in light of our decision to reverse Defendant's convictions and remand for a new trial. *See State v. Roman*, 1998-NMCA-132, ¶ 16, 125 N.M. 688, 964 P.2d 852 (stating that this Court will not usually "reach out to decide issues unnecessarily" (internal quotation marks and citation omitted)).

**CONCLUSION**

{35} For the foregoing reasons we reverse Defendant's convictions for voluntary manslaughter and aggravated battery and remand to the district court for further proceedings consistent with this Opinion.

{36} **IT IS SO ORDERED.**

_____
**M. MONICA ZAMORA, Judge**

**WE CONCUR:**

_____
**MICHAEL D. BUSTAMANTE, Judge**

_____
**MICHAEL E. VIGIL, Judge**