# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2021-NMCA-062

Filing Date: July 7, 2021

No. A-1-CA-37455

STATE OF NEW MEXICO,

      Plaintiff-Appellee,

v.

CLIVE DALTON PHILLIPS,

      Defendant-Appellant.

APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
Stan Whitaker, District Judge

Certiorari Granted, November 1, 2021, No. S-1-SC-38910; Cross-Petition Granted,
November 1, 2021, No. S-1-SC-38910. Released for Publication December 14, 2021.

Hector H. Balderas, Attorney General
Santa Fe, NM
Lauren J. Wolongevicz, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Caitlin C.M. Smith, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## OPINION

**DUFFY, Judge.**

**{1}**    Defendant Clive Dalton Phillips was convicted of seven crimes stemming from his attack on Alexzandria Buhl (Allie) and Adrian Carriaga, during which Defendant beat and shot both victims and killed Adrian. On appeal, Defendant advances three double jeopardy challenges, arguing that he committed a single, sustained attack and should be convicted of and sentenced for only two offenses: one count of voluntary manslaughter for killing Adrian and one count of aggravated battery against a

household member for his attack on Allie. We conclude that one of Defendant's convictions for aggravated battery and Defendant's misdemeanor conviction for aggravated battery against a household member violate double jeopardy principles and must be reversed, but otherwise affirm.

**BACKGROUND**

{2}     Defendant and Allie had dated on and off since high school and began living together in 2010, the year before Allie graduated. In the summer of 2013, they shared a four-bedroom home with their close friends, Sean Madrid and Adrian. Allie gave birth to Defendant's daughter in May 2013. Not long afterward, however, she broke off the relationship when she discovered that Defendant had been cheating on her. They both continued to live in the home with Sean and Adrian, but Allie moved into a separate room with the baby (hereinafter, Allie's room).

{3}     On the night of August 31, 2013, Defendant was at a friend's house and planned to stay the night. Allie, Sean, and Adrian were at home hanging out in the backyard. Defendant's and Allie's daughter was with Allie's parents. Sean testified that both Allie and Adrian turned in before he did, and when he went inside later that night, he heard moaning sounds coming from Allie's room. Sean deduced that Allie and Adrian were having sex and called Defendant at 3:49 a.m. to tell him.

{4}     Defendant drove home, grabbed a baseball bat, and walked into Allie's room. He turned on the light and found Allie and Adrian naked in bed together. Defendant began hitting Adrian with the bat, striking him numerous times in the head and other parts of the body. Defendant then turned around and began beating Allie with the bat. During the attack, both Defendant and Allie yelled to Sean to call the police. Allie testified that Defendant "lost interest in the bat," he dropped the bat and left the room, at which point she closed and locked the door.

{5}     Defendant went to his room and grabbed a handgun. He returned to Allie's door, shot at the handle three times, and kicked the door open. Defendant entered the room and shot Adrian twice in the chest. Allie observed that Defendant's gun was empty; he left the room again. Allie called 911. At that point, Adrian was still alive and speaking.

{6}     While Allie was on the phone with 911, Defendant returned with a rifle. He placed the barrel under Adrian's chin and asked, "Are you ready?" before pulling the trigger, killing him. Defendant then turned the rifle on Allie and shot her in the leg. At some point, Defendant picked up the phone and spoke with the 911 operator for about two minutes. He identified himself and described what had happened, saying, "I just killed my best friend." After Defendant ended the call with the 911 operator, he began punching and choking Allie until she blacked out. The entire event lasted about eight minutes and ended when police arrived. Defendant immediately identified himself as the shooter and was taken into custody, where he gave an hour-long interview describing the events in detail.

**{7}** The State charged Defendant with first-degree murder and the lesser included offenses of second-degree murder, contrary to NMSA 1978, Section 30-2-1 (1994), and manslaughter, contrary to NMSA 1978, Section 30-2-3 (1994) (Count 1); two counts of aggravated battery (deadly weapon), contrary to NMSA 1978, Section 30-3-5 (1969) (Counts 2 and 3); and four counts of aggravated battery against a household member, contrary to NMSA 1978, Section 30-3-16 (2008, amended 2018) (Counts 4-7). After a week-long trial, a jury found Defendant guilty on all six of the various aggravated battery charges but could not reach a unanimous verdict on Count 1—the homicide charge related to Adrian's death. Following an appeal to determine whether Defendant could be retried on first- or second-degree murder charges, *see State v. Phillips*, 2017-NMSC-019, ¶ 18, 396 P.3d 153 (holding that the only remaining count for which Defendant could be retried was voluntary manslaughter), Defendant changed his plea to guilty on the remaining voluntary manslaughter charge. The district court sentenced Defendant to twenty-five years' imprisonment, seven of which the court suspended. Defendant appeals.

## DISCUSSION

**{8}** "The Double Jeopardy Clause of the Fifth Amendment protects citizens against multiple punishments for the same offense." *State v. Bernal*, 2006-NMSC-050, ¶ 7, 140 N.M. 644, 146 P.3d 289. "Multiple punishment cases are of two types: those cases in which a defendant is charged with multiple violations of a single statute based on a single course of conduct ('unit of prosecution' cases) and those cases in which a defendant is charged with violating different statutes in a single course of conduct ('double-description' cases)." *State v. Sena*, 2020-NMSC-011, ¶ 44, 470 P.3d 227. Defendant's three double jeopardy arguments advance both types of multiple punishment challenges. "Appellate review of a claim that multiple punishments have been imposed for the same offense in violation of the Fifth Amendment prohibition against double jeopardy presents a question of law which we review de novo." *Id.* ¶ 43.

### I. Convictions Stemming From Defendant's Attack on Adrian

### A. Two Counts of Aggravated Battery

**{9}** Defendant first raises a unit of prosecution challenge as to his two convictions for aggravated battery with a deadly weapon against Adrian. The State distinguished these charges in the jury instructions based on Defendant's use of a baseball bat (Count 2) and a handgun (Count 3). "In unit of prosecution cases, where a defendant is charged with multiple violations of a single statute, we inquire whether the Legislature intended punishment for the entire course of conduct or for each discrete act." *State v. DeGraff*, 2006-NMSC-011, ¶ 32, 139 N.M. 211, 131 P.3d 61 (alteration, internal quotation marks, and citation omitted). "This analysis requires courts to determine the unit of prosecution intended by the Legislature by employing a two-part test, both parts of which are concerned with legislative intent." *State v. Swick*, 2012-NMSC-018, ¶ 33, 279 P.3d 747. "First, courts must analyze the statute at issue to determine whether the Legislature has defined the unit of prosecution." *Id.* If the statute does not define the unit of prosecution,

"then we move to the second step, in which we determine whether a defendant's acts are separated by sufficient 'indicia of distinctness' to justify multiple punishments under the same statute." *Bernal*, 2006-NMSC-050, ¶ 14.

## 1. Section 30-3-5 Does Not Define a Unit of Prosecution

{10}    Section 30-3-5(A) defines "aggravated battery" as "the unlawful touching or application of force to the person of another with intent to injure that person or another." The statutory language does not specify a unit of prosecution. This Court acknowledged as much in *State v. Mares*, 1991-NMCA-052, ¶ 24, 112 N.M. 193, 812 P.2d 1341, when we evaluated allegations of multiple aggravated batteries against a single victim. *Mares* relied on *Herron v. State*, 1991-NMSC-012, 111 N.M. 357, 805 P.2d 624, where our Supreme Court analyzed the language of the criminal sexual penetration statute and "held that the statute did not 'punish separately each penetration occurring during a continuous attack absent proof that each act of penetration is in some sense distinct from the others.' " *Mares*, 1991-NMCA-052, ¶ 24 (quoting *Herron*, 1991-NMSC-012, ¶ 15). We expressly adopted the same approach for allegations of multiple batteries, indicating without analysis that the aggravated battery statute did not separately punish each act of unlawful touching occurring during a continuous attack unless the acts are sufficiently distinct. *Id.*

{11}    Although Defendant concedes that the statute does not express a unit of prosecution, he asserts that the unit of prosecution should constitute a single unit of prosecution per victim. Defendant relies on *State v. Ramirez*, 2018-NMSC-003, ¶ 53, 409 P.3d 902, in which the New Mexico Supreme Court reasoned that "where a statute prohibits the doing of some act to a victim specified by a singular noun, 'a person' for example, then 'the person' is the unit of prosecution." However, Defendant acknowledges that even if we measure the unit of prosecution in this way, the statute does not "explain how to determine whether or when a person has been the victim of more than one battery." Consequently, it is evident that the unit of prosecution for aggravated battery is ambiguous at the first step of the analysis and, like *Mares*, resolution of Defendant's double jeopardy challenge turns on whether sufficient indicia of distinctness weigh in favor of separate offenses.

## 2. Sufficient Indicia of Distinctness Justify Multiple Punishments

{12}    To determine whether a defendant's acts are separated by sufficient indicia of distinctness to justify multiple punishments, we consider the (1) temporal proximity of the acts; (2) location of the victim during each act; (3) existence of an intervening act; (4) sequencing of the acts; (5) defendant's intent as evidenced by his conduct and utterances; and (6) number of victims. *Herron*, 1991-NMSC-012, ¶ 15. Given that there was little time between the attack with the bat and the attack with the handgun and both attacks occurred in the same location against the same victim, the parties do not dispute that the timing, location, and number of victims all weigh in favor of a single offense. They focus, instead, on the three remaining factors—whether the sequencing

of the acts, an intervening event, and Defendant's intent demonstrate sufficient distinctness to sustain separate convictions.

**{13}** The evidence at trial was that Defendant initially entered Allie's room and attacked Adrian with the baseball bat. After a struggle, Defendant let go of the bat and left the room, at which point Allie closed and locked the door. Defendant retrieved a handgun from his room and went back, but had to shoot at the door's handle and kick down the door to regain entry. Once inside, Defendant shot Adrian twice in the torso. This evidence demonstrates clear sequencing, *see State v. Lucero*, 2015-NMCA-040, ¶ 24, 346 P.3d 1175, and the use of different weapons and different types of force are evidence of distinct conduct. *See Bernal*, 2006-NMSC-050, ¶ 21.

**{14}** The evidence also demonstrates an identifiable intervening event separating Defendant's attack with the baseball bat from his second attack with the handgun. *See State v. Garcia*, 2009-NMCA-107, ¶ 15, 147 N.M. 150, 217 P.3d 1048 (evaluating whether an interruption in the course of an altercation constituted a "significant separating event"). Defendant contends that a brief separation in time or change in circumstances does not necessarily constitute an intervening event. However, we agree with the State that there was a demonstrable break in the incident when Defendant left the room and his victims attempted to bar any further interaction by locking Defendant out; Defendant had to force his way through a locked door in order to attack the victims again. In other circumstances, our courts have characterized a victim's efforts to protect themself from a defendant during an attack with different weapons as an intervening event, and the same conclusion is warranted here. *See, e.g., DeGraff*, 2006-NMSC-011, ¶ 30 (holding a defendant's conduct was not unitary when the defendant used several weapons and an intervening struggle occurred between the initial use of force and death); *State v. Cooper*, 1997-NMSC-058, ¶ 61, 124 N.M. 277, 949 P.2d 660 (holding that, in the course of an attack involving three different deadly weapons, the struggle following the first attack was an intervening event).

**{15}** In addition, there is evidence that Defendant's intent changed after the attack with the baseball bat. When police interviewed Defendant, he described how, after hitting Adrian with the bat, he remembered that Adrian usually slept with a gun near his bed. Defendant told police that "there is no way this guy is going to shoot me for sleeping with the mother of my child" and explained how he left the room to retrieve his gun. When the police later asked Defendant why he used the baseball bat first, Defendant responded, "I really didn't think I was going to shoot anybody. . . . I had no intention of killing somebody." This evidence indicates that Defendant's intent changed as the attack unfolded. *See State v. Demongey*, 2008-NMCA-066, ¶ 15, 144 N.M. 333, 187 P.3d 679 (noting that a defendant's conduct may support "an inference that the nature of [his] intent changed from shooting at the victim who had approached his vehicle to hunting down the victim in order to finish what he started").

**{16}** Under these facts, we cannot characterize Defendant's conduct as one unitary act. Time and space considerations are not dispositive when the "quality and nature of the acts" and the "objects and results involved" both weigh in favor of distinctness.

*Bernal*, 2006-NMSC-050, ¶ 16 (internal quotation marks and citation omitted). Defendant used separate and discrete acts of force against Adrian, separated by an intervening event and a change in intent. Given this, we believe the indicia of distinctness justify characterizing Defendant's conduct as two distinct acts of aggravated battery rather than a single, continuous attack. We hold that Defendant's two convictions for aggravated battery do not violate double jeopardy.

## B.      Aggravated Battery With a Deadly Weapon and Voluntary Manslaughter

**{17}**    Defendant also raises a double description challenge as to his convictions for aggravated battery with a deadly weapon (Count 3) and voluntary manslaughter (Count 1), arguing that his convictions result in multiple punishments for the same conduct. We evaluate double description challenges using the two-part test set forth in *Swafford v. State*, 1991-NMSC-043, ¶ 25, 112 N.M. 3, 810 P.2d 1223. "First, we examine whether the conduct was unitary, meaning whether the same criminal conduct is the basis for both charges." *Bernal*, 2006-NMSC-050, ¶ 9. If so, we then consider "whether the [L]egislature intended to create separately punishable offenses." *Swafford*, 1991-NMSC-043, ¶ 25.

**{18}**    At the first step of the analysis, our Supreme Court has said that "[t]he proper analytical framework is whether the facts presented at trial establish that the jury reasonably could have inferred independent factual bases for the charged offenses." *State v. Franco*, 2005-NMSC-013, ¶ 7, 137 N.M. 447, 112 P.3d 1104 (internal quotation marks and citation omitted). "To determine whether a defendant's conduct was unitary, we consider such factors as whether acts were close in time and space, their similarity, the sequence in which they occurred, whether other events intervened, and the defendant's goals for and mental state during each act." *Id.* "[W]e have also looked to the elements of the charged offenses, the facts presented at trial, and the instructions given to the jury." *Sena*, 2020-NMSC-011, ¶ 46.

**{19}**    In this case, Defendant's manslaughter conviction was not the result of a jury verdict; the jury deadlocked on the homicide charge and after the New Mexico Supreme Court determined that Defendant could only be retried for voluntary manslaughter, he changed his plea to guilty, obviating the need for a new trial. *Phillips*, 2017-NMSC-019, ¶ 2; *see also State v. Nunez*, 2000-NMSC-013, ¶ 99, 129 N.M. 63, 2 P.3d 264 (stating that a defendant may raise a double jeopardy claim on appeal even when he enters a guilty plea that was not conditioned on reservation of that claim). Importantly, Defendant never stipulated to a specific factual basis for the manslaughter conviction during his plea hearing, nor did the State describe one in conjunction with Defendant's change in plea. As well, there was no written plea agreement from which we can conclude, for example, that the manslaughter conviction stemmed exclusively from Defendant's use of the rifle. Under these circumstances, the only reasonable inference we can draw is that the factual basis for Defendant's guilty plea and resulting conviction is the same as the evidence presented at trial.

**{20}** For the aggravated battery charged in Count 3, the State was required to prove that Defendant "touched or applied force to Adrian Carriaga by shooting him in the torso with a handgun[.]" For voluntary manslaughter, the State was required to prove that Defendant "killed Adrian Carriaga[.]" In other words, while the jury instructions tied the aggravated battery charge to the handgun shooting, the jury instructions did not specify any particular conduct as the basis for the homicide charges and did not limit the evidence the jury could consider.

**{21}** At trial, the State's evidence established that after Defendant shot Adrian twice with the handgun, he ran out of ammunition and left the room again. Defendant went to his room and exchanged his handgun for a rifle. He grabbed three rounds from his dresser, loaded the rifle, and returned to Allie's room, where he placed the barrel under Adrian's chin and shot him a third time.

**{22}** Dr. Linda Syzmanski, a forensic pathologist who performed the autopsy on Adrian, testified about the gunshot wounds and cause of death. She stated that while the gunshot wounds to the chest could be fatal, "it would take time," and opined that if Adrian had received medical treatment immediately, he could have survived. When asked about the impact of the rifle shot, she testified, "It could be instantaneously fatal. . . . Or [he] could die within a couple minutes. There was extensive injury to the brain." The prosecutor then asked, "Based on what you know, how would you describe which injury took away the life of Adrian Carriaga?" Dr. Syzmanski responded, "The injury that was most fatal was the one to the head." The prosecutor concluded her direct examination of Dr. Syzmanski by asking:

> Q.    [H]ave you been able to form an expert opinion regarding the cause and manner of death?
>
> A.    The cause of death was *multiple gunshot wounds*, and the manner of death was homicide.

(Emphasis added.)

**{23}** Relying on Dr. Syzmanski's testimony, Defendant argues that the first two gunshot wounds were part of the conduct that ultimately killed Adrian, and therefore, the manslaughter charge included the same conduct that formed the basis of the aggravated battery charge. The State responds that "the aggravated battery was specifically grounded on the handgun shooting and the voluntary manslaughter was based on the rifle shooting." However, there was no specificity in the jury instructions that would permit the jury or a reviewing court to conclude that a conviction for manslaughter was linked solely to Defendant's use of the rifle, and the conduct that formed the basis of the manslaughter conviction was not articulated at the plea hearing that followed trial.

**{24}** Nevertheless, based on the elements of the charged offenses and the evidence presented at trial, the factual basis for Defendant's voluntary manslaughter conviction

might have been the rifle shot alone, as the State argues. In that event, the jury could reasonably have found two distinct acts based on the sequence of the attacks and the resulting injuries. *See Franco*, 2005-NMSC-013, ¶ 7. The shootings were separated by Defendant's act of leaving the room to change weapons, and our Supreme Court has "found sufficient indicia of distinctness when a defendant used one weapon in his initial application of force and another weapon in a subsequent attack." *State v. Foster*, 1999-NMSC-007, ¶ 34, 126 N.M. 646, 974 P.2d 140, *abrogated on other grounds as recognized by Kersey v. Hatch*, 2010-NMSC-020, ¶ 17, 148 N.M. 381, 237 P.3d 683. Moreover, the jury might have concluded that the handgun shooting was not part of the conduct that "killed" Adrian because the evidence established that Adrian was alive and speaking following the two shots to the torso, and Dr. Syzmanski's testimony indicated that Adrian could have survived his injuries if Defendant had ended the attack at that point.

**{25}** But Dr. Syzmanski also testified that Adrian's death was caused by multiple gunshot wounds, which supports the conclusion that the conduct underlying the convictions was unitary. In addition, the jury heard Defendant's interview with the police, during which he described how he was motivated to get his rifle specifically because his handgun was empty and Adrian was not yet "immobilize[d]." From this, the jury could have inferred that both shootings were part of a sustained effort to kill Adrian arising from a single intent. *See Demongey*, 2008-NMCA-066, ¶ 12. This Court has said that "if multiple shots are fired all pursuant to a single, continuous intent, they constitute a single offense, irrespective of whether an extensive period of time elapses between each shot." *Id.* ¶ 13 (internal quotation marks and citation omitted); *see also id.* ¶ 16 (stating that the fact that the defendant had to reload, re-aim and refire a bolt action rifle was incidental, rather than probative of his intent in the unitary conduct analysis).

**{26}** On this record, we are unable to determine whether the manslaughter was accomplished by the rifle shot alone or by multiple gunshots. In an analogous case, our Supreme Court resolved the matter by presuming the conduct was unitary. *Franco*, 2005-NMSC-013, ¶ 11; *see also State v. Simmons*, 2018-NMCA-015, ¶ 27, 409 P.3d 1030 ("When the conduct underlying two convictions could be unitary under the facts, but we are unsure if the jury relied on that unitary conduct for both convictions, we nevertheless assume for the purposes of our double jeopardy analysis that the conduct was unitary because one of the options/alternatives/scenarios is legally inadequate.").

**{27}** In *Franco*, the jury found the defendant guilty of tampering with evidence and possession of cocaine after police discovered a Tylenol bottle containing crack cocaine on the ground outside an apartment, underneath a bathroom window, during a search. 2005-NMSC-013, ¶¶ 2-3. The evidence at trial established that the defendant was inside the apartment for approximately forty-five minutes before police arrived, during which time she handled a Tylenol bottle until the owner of the apartment told her not to and took possession of it. *Id.* ¶ 3. When police arrived, they found the defendant in the bathroom of the apartment, standing between the toilet and the window. *Id.* ¶ 2.

**{28}** Similar to this case, the jury instructions tied the state to a particular theory for the tampering charge—that the defendant tampered with evidence by throwing cocaine out the window—but did not limit the evidence the jury could consider for the possession charge. *Id.* ¶ 8. The Court evaluated the evidence presented at trial and concluded that the jury could have based its verdict on two possible theories. *Id.* ¶ 9. Under the first possibility, the jury could have concluded that the defendant possessed the cocaine before the police arrived and then attempted to destroy it after police arrived by throwing it out the window. *Id.* ¶ 10. The Court reasoned that under this theory, "the jury could have found two distinct acts, committed at different times, in different locations, with a different mental state and purpose, and separated by the intervening arrival of the police." *Id.* On the other hand, "the jury might have based its verdict on the theory that [the d]efendant possessed the cocaine when she tampered with evidence[,]" and "[i]n that event, the conduct was unitary." *Id.* ¶ 11. The Court said that "[b]ecause the jury could have based its verdict on the theory [that the d]efendant possessed the cocaine at the time she threw it out the window, we presume unitary conduct." *Id.*

**{29}** Applying *Franco*, we presume Defendant's conduct was unitary and proceed to the second step of the *Swafford* analysis.[1] This Court previously analyzed the Legislature's intent with respect to these two offenses in *Lucero*, 2015-NMCA-040, ¶ 31, and our holding is dispositive. We determined that aggravated battery is subsumed within voluntary manslaughter, saying that although the statutes consist of different elements, "[b]oth statutes punish overt acts against a person's safety but take different degrees into consideration." *Id.* ¶ 28 (internal quotation marks and citation omitted). Applying *Lucero* and the rule of lenity, we conclude that Defendant's convictions for

---

1We do not read our Supreme Court's recent decision in *Sena*, 2020-NMSC-011, ¶ 54, to prohibit courts from presuming unitary conduct under the circumstances presented here. *Sena* addressed the *Foster* presumption—that courts " 'must presume that a conviction under a general verdict requires reversal if the jury is instructed on an alternative basis for the conviction that would result in double jeopardy, and the record does not disclose whether the jury relied on this legally inadequate alternative.' " *Id.* ¶ 47 (quoting *Foster*, 1999-NMSC-007, ¶ 28); *see also State v. Vigil*, 2021-NMCA-024, ¶ 19, 489 P.3d 974 (stating that *Foster* "requires that we begin our analysis of whether [the d]efendant's conduct was unitary by examining the jury instructions, and where the jury is offered alternative bases for conviction, we must presume that the jury relied on the alternative that leads to a double jeopardy violation"), *cert. denied*, 2021-NMCERT-___ (No. S-1-SC-38748, April 22, 2021). *Sena* clarified that this "presumption is rebutted by evidence that each crime was completed before the other crime occurred." 2020-NMSC-011, ¶ 54. In other words, *Sena* made clear that, after applying the *Foster* presumption, courts must still evaluate the conduct underlying the convictions to determine whether the conduct is unitary or distinct. Given this context, the Court's statement that "*Foster* does not require a further presumption that the same conduct was then relied upon by the jury in convicting [the d]efendant of each crime[,]" is simply another way of expressing that courts may not skip over an evaluation of the defendant's conduct. *Id.* ¶ 54. Consequently, while *Sena* requires courts to engage in an analysis of a defendant's conduct, *Franco* provides guidance on how to proceed when, after conducting that analysis, the court determines that the conduct underlying the convictions could be unitary under the facts. Our decision to presume unitary conduct under such circumstances is in accord with *Foster*, where the Court reasoned that if one of the alternative bases for the conviction is based on unitary conduct, it is " 'legally inadequate' because it violates a defendant's constitutional right to be free from double jeopardy[.]" 1999-NMSC-007, ¶ 27. We see no indication that the Court in *Sena* sought to depart from or alter the reasoning in *Franco*, and accordingly, we rely on *Franco* as controlling authority in this case.

aggravated battery in Count 3 and voluntary manslaughter in Count 1 violate the prohibition against double jeopardy.

**{30}** The general rule is that "where one of two otherwise valid convictions must be vacated to avoid violation of double jeopardy protections, we must vacate the conviction carrying the shorter sentence." *State v. Montoya*, 2013-NMSC-020, ¶ 55, 306 P.3d 426. In this case, both voluntary manslaughter and aggravated battery (deadly weapon) are third-degree felonies, but the voluntary manslaughter charge (Count 1) carries a basic sentence of six years as compared to the three-year basic sentence for aggravated battery (Count 3). *Compare* § 30-2-3(A) (providing that voluntary manslaughter is a third-degree felony resulting in the death of a human being), *and* NMSA 1978, § 31-18-15(A)(8) (2007, amended 2019) (providing a penalty of six years' imprisonment for a third-degree felony resulting in the death of a human being), *with* § 30-3-5(C) (providing aggravated battery with a deadly weapon is a third-degree felony), *and* § 31-18-15(A)(9) (2007) (providing a penalty of three years' imprisonment for a third-degree felony). Therefore, we remand this case to the district court to vacate Defendant's conviction for aggravated battery under Count 3.

## II.    Convictions Stemming From Defendant's Attack on Allie

**{31}** Defendant was convicted of four counts of aggravated battery against a household member for his attack on Allie. The charges were separated as follows: three felony counts under Section 30-3-16(C) for hitting Allie with the baseball bat (Count 4), shooting her in the leg with the rifle (Count 5), and strangling her (Count 7), and one misdemeanor count under Section 30-3-16(B) for punching her (Count 6). Like the aggravated battery charges, Defendant raises a unit of prosecution double jeopardy challenge, arguing that the attack constitutes a continuous course of conduct and that he should be convicted and punished for a single count of aggravated battery against a household member.

**{32}** "Aggravated battery against a household member" is defined as "the unlawful touching or application of force to the person *of a household member* with intent to injure that person or another." Section 30-3-16(A) (emphasis added). Notwithstanding its similarity to the definition of aggravated battery in Section 30-3-5, "neither party argues that the unit of prosecution is clearly defined in the relevant criminal statute[]." *Demongey*, 2008-NMCA-066, ¶ 10. We therefore proceed to the second step in the analysis and review whether Defendant's acts were separated by sufficient indicia of distinctness in light of the *Herron* unit of prosecution factors.

**{33}** In line with our earlier discussion of the aggravated battery charges, we conclude Defendant's first attack on Allie with the baseball bat was distinct from the second, where he shot her in the leg with the rifle. These crimes were separated by both time and intervening events: Defendant left the room twice to exchange weapons and shot and killed Adrian before shooting Allie in the leg. An intervening event also separated the second attack from the third, when Defendant strangled her: after shooting Allie, Defendant took the phone from her and spoke with the 911 operator for two minutes,

describing what had happened until that point. After Defendant hung up, he began punching and strangling Allie multiple times until she lost consciousness.

**{34}** Defendant argues that the punching and strangling during the third attack are indistinguishable and cannot be punished separately. The State agrees and concedes that the misdemeanor conviction (Count 6) should be vacated. While we are not bound by the State's concession, we accept it here. *See State v. Caldwell*, 2008-NMCA-049, ¶ 8, 143 N.M. 792, 182 P.3d 775; *see also State v. Santillanes*, 2001-NMSC-018, ¶ 28, 130 N.M. 464, 27 P.3d 456 ("[D]ouble jeopardy requires that the lesser offense merge into the greater offense such that the conviction of the lesser offense, not merely the sentence, is vacated.").

**CONCLUSION**

**{35}** For the foregoing reasons, we reverse Defendant's convictions for aggravated battery (Count 3) and misdemeanor aggravated battery against a household member (Count 6) and remand to the district court for further proceedings consistent with this opinion.

**{36}   IT IS SO ORDERED.**

**MEGAN P. DUFFY, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Chief Judge**

**ZACHARY A. IVES, Judge**