IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number: 2024-NMSC-009**

**Filing Date: March 4, 2024**

**No. S-1-SC-38910**

**STATE OF NEW MEXICO,**

      Plaintiff-Respondent/Cross-Petitioner,

v.

**CLIVE DALTON PHILLIPS,**

      Defendant-Petitioner/Cross-Respondent.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Clara Moran, District Judge**

Bennett J. Baur, Chief Public Defender
Caitlin C.M. Smith, Assistant Appellate Defender
Santa Fe, NM

for Petitioner/Cross-Respondent

Hector H. Balderas, Attorney General
Charles J. Gutierrez, Assistant Attorney General
Santa Fe, NM

for Respondent/Cross-Petitioner

**OPINION**

**THOMSON, Justice.**

**{1}** Defendant Clive Phillips was convicted of six counts of aggravated battery and pleaded guilty to one count of voluntary manslaughter after he violently attacked Adrian Carriaga and Alexzandria Buhl (Allie), killing Adrian and severely injuring Allie. Defendant challenges his convictions, arguing that double jeopardy bars the multiple convictions with the exception of one count of battery for attacking Allie and one count of manslaughter for attacking and killing Adrian. We conclude that the manslaughter conviction and the challenged battery convictions are each based on distinct conduct and therefore do not violate Defendant's right against double jeopardy. We reverse, in part, and affirm, in part, the Court of Appeals.

## I.    BACKGROUND

{2}    Defendant, Allie, Adrian, and Sean Madrid were close friends and shared a four-bedroom house. Defendant and Allie had been in an on-and-off relationship since high school and had a baby together. In the summer of 2013, Allie broke up with Defendant and moved into her own bedroom in the house with the baby. Shortly thereafter, Allie and Adrian began a romantic relationship.

{3}    Early one morning, Sean became suspicious that Allie and Adrian were sleeping together and called Defendant, who was not home at the time, to inform him of his suspicions. Defendant drove to the house, walked into Allie's room with a baseball bat, and discovered Allie and Adrian in bed together.

{4}    Armed with the bat, Defendant struck the two numerous times, and a struggle ensued. Defendant eventually dropped the baseball bat and left Allie's room to retrieve a handgun. Allie immediately shut and locked her bedroom door, but Defendant came back, shot the door handle, and kicked the door open. Upon reentering Allie's room, Defendant shot Adrian once in the chest and once in his right armpit. Out of ammunition, Defendant left Allie's room, and Allie called 911. Defendant returned to the room soon after with a rifle. He asked Adrian, "Are you ready?", placed the rifle under Adrian's chin, and fired, killing Adrian.

{5}    Defendant then turned to Allie and shot her once in her shin and inserted his finger into her bullet wound. Defendant grabbed Allie's phone, which was still connected to 911, and before ending the call described to the operator what had happened. He then resumed his assault on Allie by punching her in the face. The two struggled before Defendant pushed Allie against the wall in the hallway and choked her, causing her to lose consciousness. The police arrived at the home shortly thereafter.

{6}    For Defendant's attack on Adrian, the jury could not reach a verdict on the murder charge or on the lesser-included offense of manslaughter for the killing of Adrian. *See* NMSA 1978, § 30-2-1 (1994) (murder); NMSA 1978, § 30-2-3 (1994) (manslaughter). However, the jury convicted Defendant of two counts of aggravated battery with a deadly weapon—one for striking Adrian with the baseball bat and one for shooting Adrian with the handgun. *See* NMSA 1978, § 30-3-5 (1969) (aggravated battery); NMSA 1978, § 31-18-16 (1993, amended 2022) (firearm enhancement). For his attack on Allie, the jury convicted Defendant of four counts of aggravated battery against a household member—one for striking Allie with the baseball bat (deadly weapon), one for shooting her with the rifle (deadly weapon), one for punching her, and one for strangling her (great bodily harm). *See* NMSA 1978, § 30-3-16 (2008, amended 2018) (aggravated battery against a household member); § 31-18-16 (1993) (firearm enhancement). Following an appeal to this Court regarding the scope of retrial on the murder charge, *see State v. Phillips* (*Phillips I*), 2017-NMSC-019, 396 P.3d 153, Defendant pleaded guilty to voluntary manslaughter for the death of Adrian. At sentencing, Defendant argued that his convictions for attacking Adrian and Allie were based on unitary conduct and therefore violated the protections afforded by the double

jeopardy clause. The district court disagreed and sentenced Defendant to twenty-five years imprisonment, suspending seven years.

**{7}** Defendant appealed, contending (1) that he should only be convicted of one count of battery for attacking Adrian and one count of battery for attacking Allie and (2) that his battery conviction for shooting Adrian with the handgun should be vacated because it was based on the same conduct as the manslaughter conviction. *State v. Phillips* (*Phillips II*), 2021-NMCA-062, ¶¶ 1, 9, 17, 31, 499 P.3d 648. The Court of Appeals affirmed Defendant's convictions for the two batteries against Adrian as they were not based on unitary conduct and therefore, did not violate double jeopardy. *Id.* ¶ 16. However, the Court concluded that the battery (handgun) and manslaughter convictions violated double jeopardy because a reasonable jury could have found either unitary conduct or distinct acts. *Id.* ¶¶ 23-26, 29. Therefore, the Court presumed that the conduct was unitary as required by *State v. Foster*, 1999-NMSC-007, ¶ 28, 126 N.M. 646, 974 P.2d 140 (holding that we must presume a defendant's conduct is unitary if the jury convicted the defendant under a general verdict and the record does not indicate whether the jury relied on a legally inadequate alternative that would result in double jeopardy), *abrogated on other grounds by Kersey v. Hatch*, 2010-NMSC-020, ¶ 17, 148 N.M. 381, 237 P.3d 683. *Id.* ¶¶ 26-29. Finally, the three battery convictions for hitting Allie with the baseball bat, shooting her with the rifle, and strangling her were affirmed. *See Phillips II*, 2021-NMCA-062, ¶¶ 1, 33. The Court accepted the State's concession that the battery conviction for punching Allie was violative of double jeopardy and reversed that conviction. *Id.* ¶¶ 34-35. That reversal is not at issue in this appeal.

**{8}** Defendant petitioned for certiorari, contending that his two battery convictions for attacking Adrian (baseball bat and handgun) and his three battery convictions for attacking Allie (baseball bat, rifle, and strangulation) all violate double jeopardy. The State cross-petitioned, arguing that the Court of Appeals erred by vacating the conviction for battery of Adrian with a handgun. We granted both petitions. We affirm Defendant's manslaughter conviction and all five of his aggravated battery convictions. We further conclude that the Court of Appeals erred in its application of the presumption announced in *Foster*. Additionally, we clarify that in conducting a double jeopardy analysis for a conviction rendered by a guilty plea, a reviewing court should examine what the record shows about whether a defendant's acts are distinct rather than what a reasonable jury could have found.

## II. DISCUSSION

**{9}** The Fifth Amendment to the United States Constitution provides that "[n]o person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb." The double jeopardy clause prohibits a court from "imposing multiple punishments for the same offense." *State v. Porter*, 2020-NMSC-020, ¶ 5, 476 P.3d 1201 (text only)[1] (citation omitted). There are two types of multiple punishment cases: "those cases in

---

[1]The "text only" parenthetical as used herein indicates the omission of all of the following—internal quotation marks, ellipses, and brackets—that are present in the quoted source, leaving the quoted text itself otherwise unchanged.

which a defendant is charged with multiple violations of a single statute based on a single course of conduct (unit of prosecution cases) and those cases in which a defendant is charged with violating different statutes in a single course of conduct (double-description cases)." *State v. Sena*, 2020-NMSC-011, ¶ 44, 470 P.3d 227 (text only) (citation omitted). "While the analysis for each type of case focuses on whether the Legislature intended multiple punishments, the particular canons of construction we apply in ascertaining the Legislature's intent depend on the specific type of multiple punishment case in front of us." *State v. Benally*, 2021-NMSC-027, ¶ 11, 493 P.3d 366 (text only) (citation omitted). We review this question of constitutional law de novo. *Porter*, 2020-NMSC-020, ¶ 11.

**{10}** This case involves both unit of prosecution and double description analyses. Defendant raises a unit of prosecution argument, contending that his multiple battery convictions violate double jeopardy because "he attacked [Adrian] and [Allie] during a single episode, which took place in a small space and a short amount of time, and therefore he should not have been convicted of more than one count of battery against each of them." The State argues under a double-description challenge that Defendant's convictions for aggravated battery with a handgun and manslaughter stemming from his attack on Adrian were not based on unitary conduct, and therefore we should reverse the Court of Appeals' determination that these convictions violate double jeopardy. We address Defendant's unit of prosecution challenge first.

## A.    Unit of Prosecution

**{11}** In a unit of prosecution case, we focus on "whether a defendant has received more punishments than the number of punishments that the Legislature intended to authorize under the facts and circumstances of the case." *Benally*, 2021-NMSC-027, ¶ 12. This is a two-part test. *Id.* First, "we must analyze the statute to determine whether the Legislature has defined the unit of prosecution." *Id.* ¶ 13 (text only) (citation omitted). We do this by considering "all markers of legislative intent . . . including the wording, structure, legislative history, legislative purpose, and quantum of punishment prescribed under the statutory scheme." *Id.* If the statute defines the unit of prosecution, "our inquiry is complete." *Id.* ¶ 14. "However, if the statute remains insurmountably ambiguous as to its intended unit of prosecution, then we apply . . . the rule of lenity— and construe the statute in favor of the defendant." *Id.* (internal quotation marks and citation omitted). "The rule of lenity requires us to presume that the Legislature did not intend to separately punish discrete acts in a defendant's course of conduct absent proof that each act was in some sense distinct from the others." *Id.* ¶ 16 (text only) (citation omitted). "After applying the rule of lenity . . . , we then turn to the second step of our analysis." *Id.*

**{12}** The second step requires us to "determine whether a defendant's acts are separated by sufficient indicia of distinctness to justify multiple punishments under the same statute." *State v. Ramirez*, 2018-NMSC-003, ¶ 56, 409 P.3d 902 (text only) (citation omitted). To determine whether a defendant's acts are sufficiently distinct, we consider the *Herron* factors: (1) temporal proximity of the acts, (2) location of the victim during each act, (3) the existence of intervening events, (4) the sequencing of the acts,

(5) the defendant's intent as evidenced by his conduct and utterances, and (6) the number of victims. *Herron v. State*, 1991-NMSC-012, ¶ 15, 111 N.M. 357, 805 P.2d 624. "[T]he six *Herron* [factors] serve as a general policy for examining distinctness, but in undertaking this analysis courts should examine the elements of the offense and any policy underlying the specific statute." *Benally*, 2021-NMSC-027, ¶ 19 (internal quotation marks and citation omitted).

**{13}** In applying the *Herron* factors, Defendant urges us to adopt "a general rule or rebuttable presumption" that "[w]hen there is an incident that occurs in a short time in a single place, the State should generally be limited to proving one purely assaultive crime for each victim." We decline to do so. We continue to hold that no *Herron* factor is dispositive, but instead that all factors should be considered together in light of the facts and circumstances of each case. *See Herron*, 1991-NMSC-012, ¶ 15 ("[N]one of these factors alone is a panacea, but collectively they will assist in guiding future prosecutions under [the relevant charging statute]."); *Swafford v. State*, 1991-NMSC-043, ¶ 28, 112 N.M. 3, 810 P.2d 1223 (adopting the *Herron* factors in the unitary conduct inquiry for double description cases and noting that time and space may easily distinguish acts in some cases, but not in every case, and that courts should consider every factor); *State v. Handa*, 1995-NMCA-042, ¶ 26 n.2, 120 N.M. 38, 897 P.2d 225 ("[T]he time between each act is not dispositive."). We also reject Defendant's argument that some, but not all, of the principles applied in double description cases for a unitary conduct inquiry apply in a unit of prosecution analysis. *See, e.g.*, *State v. DeGraff*, 2006-NMSC-011, ¶ 27, 139 N.M. 211, 131 P.3d 61 (considering whether one crime had been completed before another was committed); *State v. Cooper*, 1997-NMSC-058, ¶¶ 60-61, 124 N.M. 277, 949 P.2d 660 (considering the initial use of force against a victim as separable by "an intervening event" from subsequent but different uses of force and weapons that resulted in the victim's death). In both unit of prosecution and double description cases, "we attempt to determine, based upon the specific facts of each case, whether a defendant's activity is better characterized as one unitary act, or multiple, distinct acts, consistent with legislative intent." *State v. Bernal*, 2006-NMSC-050, ¶ 16, 140 N.M. 644, 146 P.3d 289. This necessarily requires us to consider general guideposts, such as the nature of a defendant's acts and whether one crime was completed before another. Double jeopardy jurisprudence in New Mexico is a tangled and often laborious analysis. It should be this Court's goal to simplify rather than complicate it. Therefore, we reaffirm our conclusion in *Bernal* that "we are doing a substantially similar analysis when we conduct a unitary conduct inquiry in double description cases as when we conduct a unit-of-prosecution inquiry." *Id.*

**{14}** If a defendant's acts are sufficiently distinct, "then we will presume that the defendant has not received more punishments than were statutorily authorized." *Benally*, 2021-NMSC-027, ¶ 23. However, "[i]f a defendant's acts are not sufficiently distinct, then we will return to our lenient construction of the statute and presume that the defendant has received more punishments than were statutorily authorized." *Id.* We now apply this two-step framework to Defendant's multiple battery convictions.

1.  **Defendant's two battery convictions for attacking Adrian do not violate double jeopardy**

a.  **The aggravated battery statute does not define the unit of prosecution**

**{15}** Section 30-3-5(A) defines aggravated battery as "the unlawful touching or application of force to the person of another with intent to injure that person or another." The offense is heightened to a third-degree felony if the aggravated battery is committed with a deadly weapon, as it was in this case. Section 30-3-5(C). Analyzing the plain language of the statute, the Court of Appeals held that the unit of prosecution for the aggravated battery statute is ambiguous. *Phillips II*, 2021-NMCA-062, ¶¶ 10-11 (relying on *State v. Mares*, 1991-NMCA-052, ¶ 24, 112 N.M. 193, 812 P.2d 1341, for the proposition that "the aggravated battery statute d[oes] not separately punish each act of unlawful touching occurring during a continuous attack unless the acts are sufficiently distinct"). We agree and focus our analysis on the plain language and purpose of the aggravated battery statute. *State v. Olsson*, 2014-NMSC-012, ¶ 18, 324 P.3d 1230 ("The plain language of the statute is the primary indicator of legislative intent."); NMSA 1978, § 12-2A-19 (1997) (providing that a statute's text is "the primary, essential source of its meaning").

**{16}** Both parties rely on *Ramirez*, 2018-NMSC-003, ¶ 53, for their unit of prosecution analyses to different ends. In *Ramirez*, the defendant was convicted of three counts of child abuse after shooting into a vehicle that contained three children. *Id.* ¶¶ 3-4. There, we considered whether the child abuse by endangerment statute specified the unit of prosecution. *Id.* ¶ 48. We first observed that the statute's intended unit of prosecution could be the conduct of causing or permitting a child to be endangered regardless of the number of victims because the statute focused on prohibiting a course of conduct. *Id.* ¶ 51. However, we later noted that the statute could be read to indicate that the unit of prosecution was per victim because it prohibited endangering "a child." *Id.* ¶¶ 52-53. We provided that "[it] is well established . . . that where a statute prohibits the doing of some act to a victim specified by a singular noun, 'a person' for example, then 'the person' is the unit of prosecution." *Id.* ¶ 53. Ultimately, we held that the statute was ambiguous because there were two plausible readings of the statute as to its intended unit of prosecution. *Id.* ¶ 55.

**{17}** Defendant argues that under *Ramirez*, the usual unit of prosecution for the aggravated battery statute is per victim, but argues that the statute is still ambiguous as to whether a defendant may be convicted of multiple counts of battery against the same victim during a continuous attack. The State similarly relies on *Ramirez*, arguing that the plain language of the statute specifies the unit of prosecution as per deadly weapon.[2]

**{18}** We conclude that *Ramirez* does not resolve the question before us. Section 30-3-5 prohibits touching or applying force "to the person of another," which may suggest that the unit of prosecution is per victim. However, the statute still does not specify

---

[2]We note that in the Court of Appeals, the State contended that Section 30-3-5 does not specify the unit of prosecution and argued that *Ramirez* was inapplicable, but the State now changes its position arguing that the statute does so specify.

whether someone can be punished separately for *multiple* acts of touching or applying force to the *same* victim during a continuous attack. This factual situation was not considered in *Ramirez*. *See* 2018-NMSC-003. Similarly, *Ramirez* does not support the State's interpretation that use of different deadly weapons allows for separate units of prosecution. In *Ramirez*, we explained that when a statute contains a single, direct object that is the recipient of the prohibited conduct, the unit of prosecution is by object. *Id.* ¶ 52 ("Stated grammatically, the statute contains a direct object that is the recipient of the actions of [its] verbs, and that direct object is a singular noun. This suggests that our Legislature intended the protections of [the statute] to attach to *each child* endangered, and this, in turn, suggests that the unit of prosecution for [the statute] is *by child*.") Here, Section 30-3-5(C) simply heightens the offense if it is committed "with a deadly weapon." The statute's use of the term "with a deadly weapon" is not to define the direct object or focus of the statute. Instead, it serves as an aggravating factor. Neither *Ramirez* nor any other pronouncement of this Court established a rule that if a defendant uses multiple weapons or objects during an attack, the Legislature, as a matter of law, intended to impose separate punishments. *See Herron*, 1991-NMSC-012, ¶ 13 ("[S]eparate [acts] can occur within sufficient temporal proximity to raise doubt whether the legislature intended separate punishments for those acts which could equally be inspired by a single criminal intent bent on a single assaultive episode.").

**{19}** The State further argues that a separate punishment for each deadly weapon used is supported by the purpose of the aggravated battery statute, suggesting that the "statute is directed at preserving the integrity of a person's body against serious injury." *State v. Vallejos*, 2000-NMCA-075, ¶ 18, 129 N.M. 424, 9 P.3d 668; *see also State v. Neatherlin*, 2007-NMCA-035, ¶ 16, 141 N.M. 328, 154 P.3d 703 ("The purpose of aggravating the charge and enhancing the sentence for use of a weapon is to minimize injury to human beings no matter how the injury is inflicted and discourage people from using objects to injure another." (text only) (citation omitted)). We disagree. While in some circumstances, the use of multiple deadly weapons may increase the risk of injury or death to a victim, that alone is not supportive that such an assault is always deemed nonunitary.

**{20}** Our analysis is better guided by *Herron*. In *Herron*, we addressed whether a former version of the criminal sexual penetration statute allowed a defendant to be punished for each act of sexual penetration occurring during an incident of sexual assault. 1991-NMSC-012, ¶¶ 6, 8. Concluding that the language of the statute was ambiguous on this point, we applied the rule of lenity and held that the statute "cannot be said as a matter of law to evince a legislative intent to punish separately each penetration occurring during a continuous attack absent proof that each act of penetration is in some sense distinct from the others." *Id.* ¶¶ 8, 15. Later, in *Mares*, the Court of Appeals relied on and adopted our approach in *Herron* to conclude that under the aggravated battery statute, the Legislature did not intend to punish each act of battery occurring during a continuous attack unless each act was distinct from the others. 1991-NMCA-052, ¶ 24. We agree with the *Mares* Court that the plain language of the aggravated battery statute does not clearly indicate whether a defendant can be punished for each act of battery inflicted on the same victim during a continuous attack. Therefore, we apply the rule of lenity and conclude that the Legislature did not intend to

punish multiple acts of battery in these circumstances unless each act is distinct. *See Herron*, 1991-NMSC-012, ¶ 15; *Mares*, 1991-NMCA-052, ¶ 24. We now move to the second step of the unit of prosecution analysis and determine whether Defendant's acts of hitting Adrian with the baseball bat and shooting him with the handgun were separated by sufficient indicia of distinctness by applying the six *Herron* factors.

**b.    The batteries on Adrian were sufficiently distinct**

**{21}**    In the most recent Court of Appeals proceedings, the parties agreed that the time, location, and number-of-victims factors supported unitary conduct. *Phillips II*, 2021-NMCA-062, ¶ 12. The Court of Appeals focused on the remaining three *Herron* factors and held that Defendant committed two distinct acts of battery because he "used separate and discrete acts of force against Adrian, separated by an intervening event and a change in intent." *Phillips II*, 2021-NMCA-062, ¶ 16. The State no longer concedes the timing and location factors, arguing now that they are "neutral" and do not weigh in favor of unitary conduct. We step back to analyze all six *Herron* factors to determine whether Defendant's acts were sufficiently distinct.

**{22}**    The attack unfolded with Defendant walking into Allie's room and striking Adrian and Allie with the baseball bat. There was a struggle over the bat, and Sean immediately called 911. Defendant left the room to retrieve a handgun. Allie locked the door behind him. Approximately one minute and forty seconds into Sean's 911 call, Defendant shot the door handle to get back into Allie's room and shot Adrian twice.

**{23}**    The one minute and forty second gap between the battery with the baseball bat and the battery with the handgun was, in this case, a significant elapse of time. This, however, is not the only evidence that supports distinct conduct. *Cf. State v. Demongey*, 2008-NMCA-066, ¶ 15, 144 N.M. 333, 187 P.3d 679 (concluding that a time elapse of two minutes between two acts did not support distinct conduct because there was no evidence indicating a change in intent or nature of the acts). There were multiple intervening events between the batteries in this case. First was the struggle over the baseball bat. Next, Defendant left Allie's bedroom after dropping the bat and retrieved the handgun. *See, e.g.*, *DeGraff*, 2006-NMSC-011, ¶ 30 (providing that a defendant's struggle with the victim constitutes an intervening event). Finally, Defendant shot the door handle and kicked the door open before shooting Adrian.

**{24}**    Defendant also used two different weapons to attack Adrian. *See, e.g.*, *Foster*, 1999-NMSC-007, ¶ 34 (concluding that the use of different weapons indicates distinct conduct). Each application of force, as well as the injuries inflicted, were also distinct; the baseball bat assault was nonfatal, whereas the two handgun shots inflicted more serious injuries. *See Bernal*, 2006-NMSC-050, ¶ 21 (stating that different uses of force support distinct acts).

**{25}**    Furthermore, we agree with the Court of Appeals that there was evidence that Defendant's intent had changed from the time he attacked Adrian with the baseball bat to the time that he shot Adrian with the handgun, thus evincing distinct conduct. *Phillips II*, 2021-NMCA-062, ¶ 15 (citing *Demongey*, 2008-NMCA-066, ¶ 15). After his arrest,

Defendant told police that when he hit Adrian with the baseball bat, he did not think that he was going to shoot or kill anybody. However, Defendant explained that after he battered Adrian, he remembered Adrian usually slept with a gun nearby, so he went to his bedroom to retrieve the handgun to immobilize or kill Adrian. Defendant argues that the Court of Appeals' separate-intent analysis rested on a "factual conclusion about [Defendant's intent to kill] that the jury rejected." We disagree mainly because Defendant was not acquitted of murder; the jury simply did not reach a verdict. Additionally, Defendant's argument that the jury did not make an express finding regarding his intent to kill has no bearing on our analysis. *See Herron*, 1991-NMSC-012, ¶ 15 (providing that courts determine intent "as evidenced by [the defendant's] conduct and utterances"). Defendant's conduct and statements to police demonstrate that he had not formulated an intent to kill Adrian with the baseball bat but that he had formulated this intent when shooting Adrian with the handgun. Therefore, there was a clear change in intent between each attack.

**{26}**   We recognize that Adrian was the only victim in both of these attacks and that he remained in the same location for each. However, we decline to place great weight on the latter fact given that Adrian stayed or was forced to stay in one location, in the room with the door that Allie locked, to avoid further harm from Defendant's attacks.

**{27}**   Therefore, we conclude that four of the *Herron* factors strongly support that Defendant's two convictions of battery for the injuries he inflicted on Adrian do not violate double jeopardy as Defendant's two attacks were distinct. *See State v. Jackson*, 2020-NMCA-034, ¶ 33, 468 P.3d 901 ("[A]lthough [the v]ictim and location of [the d]efendant's kidnappings overlap, there was sufficient evidence that the two kidnappings were separated by . . . sufficient indicia of distinctness . . . and, as a result, . . . do not violate double jeopardy.").

## 2.      The three battery convictions for the injuries inflicted on Allie do not violate double jeopardy

### a.      The aggravated battery against a household member statute at issue did not clearly specify the unit of prosecution

**{28}**   The language of the statutes for aggravated battery and aggravated battery against a household member is almost identical, and, consistent with our previous references herein, the parties advance the same arguments as to the intended unit of prosecution for the aggravated battery statute as for the aggravated battery against a household member statute, *see* Section II.A.1, paragraph 17, *supra*. The latter requires that the offense be committed against "a household member" while the former requires the offense be committed against "another." *Compare* § 30-3-16(A) (2008)[3], *with* § 30-3-5(A). The State added one additional argument: each application of force that caused or could have caused great bodily harm, *see* §§ 30-3-5(C), 30-3-16(C) (2008), creates an alternative unit of prosecution.

---

3Defendant was convicted under the 2008 version of Section 30-3-16. However, the Legislature's 2018 amendments to the statute do not affect our analysis.

**{29}** Like the aggravated battery statute, the plain language of the aggravated battery against a household member statute does not clearly indicate whether a defendant can be punished separately for each act of battery against the same household member during a continuous attack. *See* Section II.A.1, paragraph 20, *supra*; *Herron*, 1991-NMSC-012, ¶ 15; *Mares*, 1991-NMCA-052, ¶ 24. Similar to our previous rejection of this very argument from the State applied to aggravated battery, we reject the State's argument that the aggravated battery against a household member statute defines the unit of prosecution as per deadly weapon or by each application of force that caused or could have caused great bodily harm. Therefore, we apply the rule of lenity and conclude that the statute does not separately punish each act of battery inflicted on the same victim during a continuous attack unless each act is sufficiently distinct.

### b.    Defendant's acts of battery against Allie are separated by sufficient indicia of distinctness

**{30}** We apply the six *Herron* factors to the attack on Allie and begin by examining Allie's location during each battery. Allie remained in her room when first attacked with the baseball bat and later attacked with the rifle; however, she changed locations within the room. *Herron* recognizes that movement of a victim in between a defendant's acts supports distinct conduct. *See* 1991-NMSC-012, ¶ 15 ("[M]ovement or repositioning of the victim between [acts] tends to show separate offenses."). Further, similar to our analysis regarding the batteries on Adrian, we decline to weigh in favor of unitary conduct the fact that Allie remained in her room, which she locked after the first attack in an effort to protect herself and Adrian from a subsequent assault.

**{31}** In addition, Allie was in a different location of the home for the battery with the rifle than where she was for the battery by punching and strangulation. Defendant first shot Allie in the leg with the rifle in her room, and then he moved her into the hallway where he punched and strangled her. *See, e.g., Bernal*, 2006-NMSC-050, ¶ 21 (stating that the use of force "in different parts of the [victim's] house" supports distinct conduct).

**{32}** The interval of time between the attacks remains significant to our analysis of whether the batteries were distinct. *Cf. Demongey*, 2008-NMCA-066, ¶ 15. Based on audio recordings of Sean's and Allie's separate 911 calls placed during these attacks, there was an approximate two-minute break after both the first and second of the three successive batteries inflicted on Allie.

**{33}** During each break between the batteries, there were also numerous intervening events. After hitting Allie with the baseball bat and before shooting her with the rifle, Defendant struggled with both victims, left Allie's room to retrieve the handgun, shot Allie's door, kicked the door open, shot Adrian twice with the handgun, left the room again to retrieve the rifle, and then killed Adrian by shooting him in the head. And after shooting Allie with the rifle, Defendant talked with the 911 operator Allie had phoned for approximately two minutes describing the attacks before he began punching and strangling Allie.

**{34}** Defendant also committed each act in a distinct manner. Defendant used different weapons for each battery against Allie, *see, e.g.*, *Foster*, 1999-NMSC-007, ¶ 34, and Defendant used different degrees of force by hitting her with the baseball bat all over her body, shooting her in the leg with a rifle, and then punching and strangling her until she lost consciousness, *see Bernal*, 2006-NMSC-050, ¶ 21.

**{35}** Defendant's intent to harm Allie may have remained the same throughout the attack, but the evidence shows that Defendant ceased his actions and reformulated this intent between each battery. *Cf. Demongey*, 2008-NMCA-066, ¶ 16 (concluding there was no evidence indicating that the defendant rethought his actions or ceased his actions and then reformulated his intent); *State v. Garcia*, 2009-NMCA-107, ¶ 14, 147 N.M. 150, 217 P.3d 1048 (stating there was no evidence that the defendant's intent to batter the victim was "interrupted, altered, or changed"). After hitting Allie with the baseball bat, Defendant ceased his attack, left the room multiple times, shot and killed Adrian, and then shot Allie with the rifle. Defendant again ceased his attack on Allie when he talked with the 911 operator before renewing a separate battery in the hallway.

**{36}** Defendant's batteries against Allie were clearly distinct, and his three convictions for aggravated battery against a household member do not violate double jeopardy.

## B.    Double Description

**{37}** On cross-appeal, the State challenges the Court of Appeals' determination that Defendant's convictions for aggravated battery with the handgun and manslaughter violate double jeopardy. In double description cases, we again apply "a two-part analysis for deciding whether the same offense was committed." *Sena*, 2020-NMSC-011, ¶ 45. "The first part focuses on the conduct and asks whether the conduct underlying the offenses is unitary, i.e., whether the same conduct violates multiple statutes." *Id.* (text only) (citation omitted). If the conduct is unitary, "we proceed to the second part, which focuses on the statutes at issue to determine whether the legislature intended to create separately punishable offenses." *Id.* (text only) (citation omitted). A defendant's double jeopardy rights are violated only "when (1) the conduct is unitary and (2) it is determined that the Legislature did not intend multiple punishments." *Id.* If a defendant's double jeopardy rights are violated, courts must "vacate the conviction carrying the shorter sentence." *State v. Torres*, 2018-NMSC-013, ¶ 28, 413 P.3d 467. Both parties agree that the Court of Appeals' holding on legislative intent is not before us, and therefore our focus is limited to whether Defendant's conduct was unitary.

**{38}** A defendant's conduct is unitary "if the acts are not separated by sufficient indicia of distinctness." *Porter*, 2020-NMSC-020, ¶ 12 (text only) (citation omitted). As previously noted, we apply the six *Herron* factors in the double description analysis to determine whether a defendant's acts are unitary or distinct. *Swafford*, 1991-NMSC-043, ¶ 28. We consider "the elements of the charged offenses, the facts presented at trial, and the instructions given to the jury." *Sena*, 2020-NMSC-011, ¶ 46; *Porter*, 2020-NMSC-020, ¶ 12. "Unitary conduct is not present when one crime is completed before another is committed, or when the force used to commit a crime is separate from the force used to commit another crime." *Sena*, 2020-NMSC-011, ¶ 46. However, "if it

reasonably can be said that the conduct is unitary, then we must conclude that the conduct was unitary." *Porter*, 2020-NMSC-020, ¶ 12 (text only) (citation omitted).

**{39}**    In this case, the instruction for aggravated battery with the handgun required the jury to find that Defendant "touched or applied force to Adrian . . . by shooting him in the torso with a handgun." However, the instruction for manslaughter required the jury to find that Defendant "killed Adrian." Thus, although the jury instruction for the aggravated battery charge specified the conduct that formed the basis of the charge, the manslaughter instruction did not. The jury convicted Defendant of the aggravated battery charge but hung on the manslaughter charge. Defendant's subsequent guilty plea for manslaughter did not specify a factual basis for his plea.

**{40}**    As a result, the Court of Appeals applied the *Foster* presumption. *See Phillips II*, 2021-NMCA-062, ¶¶ 26-29. In *Foster*, we held that "we must presume that a conviction under a general verdict requires reversal if the jury is instructed on an alternative basis for the conviction that would result in double jeopardy, and the record does not disclose whether the jury relied on this legally inadequate alternative." 1999-NMSC-007, ¶ 28. We adopted this presumption because "we cannot assume that jurors will know to avoid an alternative basis for reaching a guilty verdict that would result in a violation of the Double Jeopardy Clause." *Id.* However, in *Sena*, we clarified that "*Foster* does not require a further presumption that the same conduct was then relied upon by the jury in convicting [a d]efendant of each crime—particularly when the record indicates [distinct crimes] were committed." 2020-NMSC-011, ¶ 54. Thus, the *Foster* presumption can be "rebutted by evidence that each crime was completed before the other crime occurred." *Id.* After reviewing the evidence presented at trial, the Court of Appeals in this case conclusively presumed that Defendant's conduct was unitary because it was "unable to determine whether the manslaughter was accomplished by the rifle shot alone or by multiple gunshots." *Phillips II*, 2021-NMCA-062, ¶¶ 21-26, 29 & n.1.[4]

**{41}**    As an initial matter, we note that our appellate courts have never applied the *Foster* presumption to convictions based on guilty pleas. However, we assume without deciding that the *Foster* presumption applies in this case because the jury instructions and guilty plea for the manslaughter conviction do not specify what conduct forms the basis of the manslaughter conviction.[5] Therefore, we agree with the Court of Appeals that "the only reasonable inference . . . is that the factual basis for Defendant's guilty plea and resulting conviction is the same as the evidence presented at trial." *Phillips II*,

---

[4]The Court of Appeals relied on our decision in *State v. Franco*, 2005-NMSC-013, ¶¶ 9-11, 137 N.M. 447, 112 P.3d 1104, where we conclusively applied the *Foster* presumption despite evidence that each act was distinct. *Phillips II*, 2021-NMCA-062, ¶¶ 26-29 & n.1. In *Sena*, we clarified that the *Foster* presumption should not be applied conclusively, but is instead rebutted by evidence in the record supporting distinct conduct. 2020-NMSC-011, ¶ 54. Therefore, *Sena*, rather than *Franco*, is the proper analysis.

[5]The State argues that "Defendant has the burden of creating the factual record for a double jeopardy claim," and because he did not specify within his guilty plea "whether the underlying factual basis was the rifle shot alone or all the gunshots, the Court of Appeals should have resolved any lack of clarity on that issue against Defendant." Although our case law requires a defendant who pleads guilty to "provide a sufficient record for the court to determine unitary conduct," *see State v. Sanchez*, 1996-NMCA-089, ¶ 11, 122 N.M. 280, 923 P.2d 1165, the record in this case is sufficient to do so.

2021-NMCA-062, ¶ 19; *see State v. Sanchez*, 1996-NMCA-089, ¶ 11, 112 N.M. 280, 923 P.2d 1165 (explaining that a double jeopardy challenge based on a guilty plea could be resolved on the facts placed in the record). The Court of Appeals, however, viewed the evidence through the wrong lens. It viewed the evidence from the perspective of what a *reasonable jury could have concluded* during the trial despite the fact that Defendant's manslaughter conviction was a result of a guilty plea. *Phillips II*, 2021-NMCA-062, ¶¶ 24-25 (stating that the jury could have reasonably found two distinct acts or one unitary act for the aggravated battery and manslaughter convictions). This approach is mistaken. The proper analysis is not what a reasonable jury could have concluded but whether there are "sufficient facts in the record" to support distinct conduct which would defeat a double jeopardy claim. *Sanchez*, 1996-NMCA-089, ¶ 11.

**{42}** The evidence in the record shows nonunitary conduct in Defendant's acts. Defendant explained to police that he wanted to "immobilize" Adrian, so he shot Adrian twice in the torso with the handgun. Adrian was still alive when Defendant ran out of ammunition, and Defendant left the room to exchange the handgun for a rifle. Eighteen seconds later, Defendant returned to Allie's room with the rifle, placed the rifle under Adrian's chin, asked Adrian, "Are you ready?", and then pulled the trigger. Adrian immediately stopped speaking and died.

**{43}** Forensic pathologist, Doctor Linda Syzmanski, who performed Adrian's autopsy, testified at trial that the two handgun shots to Adrian's torso caused "multiple rib fractures," lacerated Adrian's lungs, and caused internal bleeding in Adrian's chest cavity. She explained that "with time," these injuries "would be fatal," but if Adrian had received medical attention, the injuries "most likely would have been curable" and Adrian could have survived. Dr. Syzmanski testified that the rifle shot caused extensive brain damage and "could be instantaneously fatal" or would have killed Adrian "within a couple of minutes." When asked which injury killed Adrian, Dr. Syzmanski responded: "The injury that was most fatal was the one to the head." She concluded that "[t]he gunshot *wound* was the cause of death." (Emphasis added.)

**{44}** Defendant urges us to rely on Dr. Syzmanski's later testimony that "[t]he cause of death was multiple gunshot *wounds*, and the manner of death was homicide." (Emphasis added.) Defendant highlights this testimony to argue that the cause of death was multiple gunshot wounds, and therefore, the manslaughter conviction encompassed the two handgun shots and the rifle shot. We disagree. It is clear from Dr. Syzmanski's testimony that the rifle shot was the fatal shot that killed Adrian.

**{45}** Additionally, based on the evidence presented, the battery was completed before the manslaughter was committed. *See Sena*, 2020-NMSC-011, ¶ 46. The battery was accomplished when Defendant shot Adrian twice in the torso using the handgun. Then, the manslaughter was accomplished when Defendant left the room, came back, and shot Adrian under the chin with the rifle, killing him. The two acts were separated by approximately eighteen seconds and the intervening event of Defendant leaving Allie's room to exchange the handgun for the rifle. *See Cooper*, 1997-NMSC-058, ¶ 61 (concluding that a defendant's conduct was distinct where the defendant used different

weapons and that the "death was not the consequence of the initial act of battery" but was followed by an intervening event). Significantly, Defendant also used different weapons for each attack and applied distinct uses of force with each. Even though Adrian remained in Allie's room for both acts, we again decline to weigh the location factor in favor of unitary conduct because Adrian was severely injured, confining him to one location.

**{46}**    Defendant argues that his conduct was unitary because of a common intent to "immobilize" or kill Adrian during both acts. We disagree. When Defendant left the room, exchanged the handgun with the rifle, came back to the room, and placed the rifle under Adrian's chin, he reformulated an intent to kill Adrian and to do so immediately. *See Herron*, 1991-NMSC-012, ¶ 15 (providing that a change in the defendant's intent supports distinct conduct); *cf. Demongey*, 2008-NMCA-066, ¶ 16 (stating that there was no evidence indicating that the defendant rethought his actions or ceased his actions and then reformulated his intent); *Garcia*, 2009-NMCA-107, ¶ 14 (stating that there was no evidence that the defendant's intent to batter the victim was "interrupted, altered, or changed").

**{47}**    Therefore, we conclude that the *Foster* presumption was rebutted because there was evidence that distinct conduct supported the battery and manslaughter convictions. The Court of Appeals erred by conclusively presuming unitary conduct when the record indicated that one crime was completed before the other and that each act was sufficiently distinct. *See Sena*, 2020-NMSC-011, ¶ 54. Because Defendant's conduct is not unitary, there is no double jeopardy violation, and we reverse the Court of Appeals' determination on this issue.

## III.    CONCLUSION

**{48}**    For the foregoing reasons, we hold that Defendant's two convictions of aggravated battery for attacking Adrian, one conviction of manslaughter for killing Adrian, and three convictions of aggravated battery against a household member for his attack on Allie do not violate double jeopardy. Therefore, we affirm the Court of Appeals in upholding two counts of aggravated battery for attacking Adrian (baseball bat, handgun), and upholding three counts of aggravated battery for attacking Allie (baseball bat, rifle, strangulation). However, we reverse the Court of Appeals in vacating the aggravated battery conviction for shooting Adrian with the handgun. We remand to the district court for further proceedings consistent with this opinion.

**{49}    IT IS SO ORDERED.**

**DAVID K. THOMSON, Justice**

**WE CONCUR:**

**C. SHANNON BACON, Chief Justice**

**MICHAEL E. VIGIL, Justice**

**BRIANA H. ZAMORA, Justice**

**T. GLENN ELLINGTON, Judge**
**Sitting by designation**